**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Crim. No. 1:21-CR-35 (RC) |
| LOGAN BARNHART, | |
| Defendant. | |

**MEMORANDUM IN AID OF SENTENCING**

I.   **Introduction**

Logan Barnhart traveled to the "Stop the Steal" rally because he wanted to support the President that he then admired and hear his final speech as President. On January 1, 2021, he saved multiple screenshots from Trump's twitter account that were encouraging his followers to attend the rally. The next day he began planning his trip to the rally and even planned his walking route from his planned accommodation to the Ellipse where the rally was to occur. He had no maps or walking plans to the Capitol building as he had no intention to go there. He did not plan to meet anyone at the rally, let alone anyone planning acts of violence. Mr. Barnhart has never been affiliated with any extremist group. Mr. Barnhart did not bring any weapons of any kind with him to Washington, D.C. He did not bring a flag or a sign; he dressed in street clothes. He did not bring any protective gear such as goggles or a helmet. His only intent in coming was to celebrate the President and hear the speeches. He drove to the District of Columbia alone by car and arrived

early in the morning, walking to the rally around 7 a.m. so he could be in a good position to hear the speeches. He arrived to the area near the JumboTron and took photos of the crowd and of the Washington Monument. He didn't leave the rally until after Trump spoke. He did not arrive at the Capitol grounds until 2:37 p.m., nearly two hours after the initial breach.

While listening to the speeches and talking to other rally-goers, Mr. Barnhart heard that the rally goers were heading toward the Capitol to protest at the Capitol so that the vote certification would be delayed during which time Vice President Pence would send the votes in "disputed" states back for a recount. President Trump alluded to this plan in his speech, inviting everyone to join him at the Capitol "to make their voices heard so that Mr. Pence 'would do the right thing.'" Mr. Barnhart is not an expert in election law. The plan to encourage a recount seemed sensible to him, especially in light of what he was hearing from then President Trump and other prominent elected officials about rampant election fraud.  So when others headed towards the Capitol, he followed.

Once he arrived, he ended up joining the crowds swelling towards the building and found himself in the area of the Lower West Terrace. He did not know any of the people who were in the area, including the individuals with whom he is charged in this case. Around 4:20 p.m., he was still standing on the south side of the Lower West Terrace when he witnessed members of the crowd falling down the stairs and individuals injured. He then joined in the crowd's activities, including the violence, which he greatly regrets. Soon after the violence, he regretted his actions

and quickly departed even though the fighting continued. He did not brag about his actions on social media and returned to his Airbnb. Now two years away from the chaos of that day, he is deeply remorseful and cannot understand how he acted so foolishly.

Mr. Barnhart has experienced severe consequences for his actions and is prepared to accept the further consequences that this Court will mete out. After his arrest, he was released with stringent conditions with which he has consistently complied despite the severe adverse health consequences he faced as a result of his location monitoring. While some of his codefendants were held without bond and others moved to lessen their pretrial conditions, Mr. Barnhart accepted his strict conditions as part of his penance for his illegal acts.

Moving forward, and for the rest of Mr. Barnhart's life, his felony conviction in this high profile matter will disrupt his ability to obtain employment and has caused him to lose other privileges and liberties afforded to all citizens. Indeed, no matter what sentence this Court imposes, Mr. Barnhart will continue to experience the ripple effects of his destructive lack of judgment for the rest of his life.

Mr. Barnhart has unequivocally accepted responsibility for his conduct. From the outset, through prior counsel and through undersigned counsel, he has communicated his desire to resolve the case, accept responsibility for his actions, and has spared the government the resources of a trial. Through counsel, he repeatedly offered to assist the government in its investigation while acknowledging that he didn't know anything that was not already captured on the incredibly vast

array of video. He knows that he must be punished for what he did. That said, Mr. Barnhart submits that the sentence requested by the government and probation is more than that which is necessary to meet the statutory purposes of sentencing, especially in light of sentences imposed on other individuals charged who engaged in similar and often more egregious conduct.

## II.     Procedural History

Mr. Barnhart was arrested on his way to work from his home in Lansing, Michigan on August 17, 2021, after being included in a superseding indictment filed on August 4, 2021, charging him and several others with various charges arising out of the events of January 6, 2021 at the United States Capitol. He was presented in the Western District of Michigan that same date on offenses of assaulting, resisting or impeding officers using a dangerous weapon, civil disorder and a series of misdemeanors. He was released on an unsecured $5000 bond and home detention with location monitoring. He was restricted to his residence at all times except for employment, education, religious services, medical, substance abuse, or mental health treatment, attorney visits, court appearances, court-ordered obligations, or other activities approved in advance by Pretrial Services. He subsequently appeared in Court in D.C., albeit virtually, on August 25, where he was arraigned and released on home detention with GPS monitoring via an ankle bracelet. His travel was restricted to the Western District of Michigan and the Eastern District of Michigan for work only. He has been fully compliant with those release conditions.

Very early on in the case while represented by another attorney with the FPD, Mr. Barnhart expressed a desire to accept responsibility and enter a guilty plea. Discovery was ongoing and the United States Attorney's Office was determining what plea offers to extend in the various categories of cases. Nevertheless, counsel for Mr. Barnhart consistently advised that it was Mr. Barnhart's intention to resolve the case by way of a guilty plea. When undersigned counsel took over the case, the discussions regarding the parameters continued, but one thing was always clear – Mr. Barnhart wanted to accept responsibility for his conduct and wanted to plead guilty. He was even willing to meet with the government if they believed it would be beneficial. During all of the discussions about trial dates, motions to be filed, etc., Mr. Barnhart through counsel indicated he was going to be pleading guilty. On September 28, 2022, Mr. Barnhart entered a guilty plea to Count 10 charging him with Assaulting, Resisting or Impeding Certain Officers Using a Dangerous Weapon in violation of 18 U.S.C. § 111(b).

### III. Objections to the Presentence Report and Grounds for Variance related to the Sentencing Guidelines

Pursuant to the plea agreement in this case, the parties agreed that the base offense level for this offense is a level 14 with a three level increase for bodily injury (not serious), a two level increase because of the use of a dangerous weapon (a flagpole that was waved around), and a 6 level increase for the offense involving an official victim (law enforcement). The parties agreed to litigate whether the restraint of a victim enhancement applied. In either event, the parties agreed to a three level reduction for acceptance of responsibility. Because Mr. Barnhart has no

criminal history points, his criminal history category is I. Thus, his sentencing

guideline range is either 41 to 51 months or 51 to 63 months, depending on how the

Court resolves the dispute over the restraint of victim enhancement addressed

below. The defense submits that the appropriate range is 41 to 51 months, but that

there are significant reasons to vary from that guideline range.

### A. The Enhancement for Physical Restraint of a Victim is not Warranted

Mr. Barnhart reviewed the PSR and has one outstanding substantive

objection to the guideline calculation contained in the PSR.[1] As noted in the plea

agreement, he maintains that the appropriate guideline calculation is 41 to 51

months. In particular, Mr. Barnhart objects to the enhancement under U.S.S.G

§3A1.3 regarding restraint of a victim.

It is important to state at the outset that Mr. Barnhart is extremely regretful

that his conduct in concert with others led to injuries of police officers. He expressed

a desire to personally apologize to them for his actions. Because this was not

possible, he has written a letter to Officer B.M. which is attached to this

Memorandum doing just that. (Ex. A) The remarks herein regarding the correct

application of the law as well as the comparison of relative culpability are

arguments that are made for the purpose of determining the appropriate

---

[1] Counsel for Mr. Barnhart apologizes for not having submitted this objection to the PSR prior to the report being finalized. When the sentencing was initially continued, counsel was under the impression that the new sentencing date would trigger a new date for objections to the PSR. However, counsel communicated its objection to this enhancement both in the plea agreement and in an email exchange with the government, giving the government the opportunity to address it in their sentencing memo, which they did. It remains for the Court to resolve.

punishment for Mr. Barnhart as compared to others, and are not made to minimize or excuse his conduct.

The United States Sentencing Guidelines provide for a two level increase "if a victim was physically restrained in the course of the offense." U.S.S.G §3A1.3. The commentary refers back to the definition of "physically restrained" in §1B1.1: "the forcible restraint of the victim such as by being tied, bound, or locked up." That is not what occurred here. This is an enhancement that is meant to be applied when the actions are significantly more than the crime charged. While the government may be correct in asserting that "such as" implies that "by being tied, bound or locked up," are just examples of ways in which someone can be physically restrained, they are at a minimum examples *meant to embody the types of actions* that would appropriately suggest an upward enhancement. Those examples are of a nature far more extensive than momentarily grabbing the vest of someone and pulling on it, thus contributing to that individual's being pulled down the stairs. What happened to Officer B.M. was terrible. Mr. Barnhart's actions were wrong, unlawful, and inexcusable. But that is not the question posed by whether this enhancement should apply to Mr. Barnhart's actions themselves (as opposed to the actions of his codefendants) under these circumstances.

While courts have held that the application of the enhancement is not *explicitly limited* to cases where the victim is tied, bound or locked up, most have noted it is important to consider whether the conduct at issue "is entirely compatible with the Application Note's examples of physical restraint ('being tied,

bound, or locked up')." *United States v. Anglin*, 169 F3d 154, 163 (2nd Cir. 1999). In *Anglin*, the Court noted that the examples in the application note, i.e., "tied" "bound" or "locked up" "while not imposing inflexible limitations upon the phrase 'physical restraint,' nonetheless are intended as meaningful signposts on the way to understanding the Sentencing Commission's enhancement purpose." *Anglin* at 164. Thus, it is necessary to assess whether the conduct is "materially different from the guidelines examples, each of which involved a restraint of movement by the use of some artifact by which the victim is 'tied' or 'bound' . . . or by the use of a space where the victim is 'locked up." *Anglin* at 164.

Using that standard, in *Anglin*, the Court found that forcefully entering a bank with a gun and ordering the victims to get down on the floor, while putting the gun in the face of one of the victims for 15 seconds, was **not sufficiently close** to the language of the examples in the Application Note, finding that the enhancement was crafted to "deal with a special circumstance" and "contemplated a more narrow set of circumstances." *Id.* at 165. *Cf. United States v. Hampton*, 260 F.3d 832, 837 (8th Cir. 2001) (restraint enhancement applied when, in production of child pornography, defendant encased 4 year old in pillow case because "a victim so encased is at least as restrained as one who is "tied").

First, it is important to look at whether the conduct is of the same nature and type encompassed in the examples in the application note, i.e., tied, bound or locked up. As such, many cases involve putting individuals in a locked or barricaded area. *See, e.g.. United States v. Nelson*, 137 F.3d 1094, 1112 (9th Cir.) (ordering employees

into back room at gunpoint constitutes physical restraint); *United States v. Jones*, 32 F.3d 1512, 1519 (11th Cir. 1994) (per curium) (forcing employees at gun point into safe room and ordering to lie down on floor and closing door constituted physical restraint); *United States v. Schau,* 1 F.3d 729 (8th Cir. 1993) (per curium) (ordering victims at gunpoint into bank vault and wedging chair against door confining them constituted physical restraint). These examples are entirely consistent with being "locked up".

While the examples of tied, bound or locked up are not exhaustive, "[t]he question presented is whether the conduct involved here falls with the concept illustrated by these examples, and is intended to be covered by Guideline § 3A1.3." *United States v. Mikalajunas*, 936 F.2d 153, 156 (4th Cir. 1991). The Court in *Mikalajunas* distinguished *United States v. Stokely*, 881 F.2d 114 (4th Cir. 1989), where the defendant placed the victim in a room with a bomb and prevented the victim from leaving from the facts in *Mikalajunas*, finding in part, "the victim [in Stokely] was *confined to a room for some time*." (emphasis added). The Court also distinguished *United States v Roberts*, 898 F.2d 1465 (10th Cir. 1990) where the defendant placed an arm around the victim's neck, held a knife to her throat and "held and threatened for a long enough period to accomplish the cash withdrawal; this would appear to be some minutes." *Id*. "[T]he examples of physical restraint in the guidelines, while not all inclusive, imply that the guidelines intend an enhancement for something other than a brief holding as part of a stabbing." *Mikalajunas* at 156. Thus, the brief holding that was part of a stabbing was not

sufficient to come within the scope of the physical restraint enhancement. *See also United States v. Old Chief*, 571 F.3d 898, 901 (9th Cir. 2009) (physical restraint enhancement applied when defendant chased down victim, held his arms while codefendant stabbed him repeatedly, finding "restraint could not be described as brief; it was ongoing during the course of the offense."); *United States v. Plenty*, 335 F3d 732, 735 (8th Cir. 2003) (physical restraint enhancement applied when victim was grabbed by her ankle, pulled her off the bed, pulled her into another room and kicked her to prevent her from moving away; conduct "likened to being bound by something").

"[T]he enhancement, as 'a provision drafted to deal with a specific circumstance,' must be interpreted narrowly." *Stokely* at 78. *Stokely* advised considering three factors: " (1) Whether the restraint was physical, (2) whether there was restraint rather than just use of force, and (3) whether the action in question was constitutive of the [offense charged] or whether it was an additional physical restraint that facilitated the [offense charged.]" The Court noted that "herding victims into a defined area without physically restraining them in that area, does not, in and of itself, constitute physical restraint." *Id*. At 80. *See also United States v. Bauman*, 60 Fed. Appx. 63 (9th Cir. 2003) (unpublished) (in second degree murder through strangulation case "while Baumann did not tie, bind or lock up his wife, he pinned her to the bathroom floor and prevented her from escaping" which was forcible confinement in a manner that prevented escape). In *Bauman*,

the Court noted that the district court properly focused on the forcible confinement, "not on the restraint inherent in the act of strangulation." *Id.*

Again, while not minimizing Mr. Barnhart's conduct, the physical restraint enhancement is typically applied in cases involving far more egregious and sustained contact with the victim than that which resulted from Mr. Barnhart's conduct. *See, e.g., Arcoren v. United States*, 929 F.2d 1235 (8th Cir. 1991) (physical restraint enhancement applied in case involving sexual abuse of minor when defendant forcefully pulled victim into bedroom, placed his hand on her throat, abused her, prevented her from leaving on numerous occasions, and forced her to have sex with him over several hours); *United States v. Amerson*, 864 F. Supp. 458 (MD PA 1994) (physical restraint enhancement applied in case involving abduction and rape of three young children who were tied up and held at gunpoint*); United States v. Rosario,* 7 F.3d 319 (2d Cir. 1993) (per curiam) (physical restraint enhancement applied when robber hit carrier over the head, knocked him to the floor, then immobilized him by stepping on his throat while robbing him); *United States v. Doubet*, 969 F.2d 341, 347 (7th Cir. 1992) (physical restraint enhancement applied when robber secured victims in isolated room with threats of death while carrying sawed off shotgun and exhorted claims of armed accomplice guarding door); *United States v. Calbert*, 426 F.Supp.3d 1022, 1033 (D.N.M. 2019) (physical restraint enhancement applied in murder case, where correctional officer observed one defendant hold victim down while defendants forcibly knocked incarcerated victim to the ground and restrained while stabbing him); *United States v. Deleon*,

437 Supp.3d  955, 1022 (D.N.M. 2020) and *United States v. Troup*, 426 F.Supp.3d 1072, 1135 (D.N.M. 2019) (physical restraint enhancement applied in prison stabbing case where defendants held fellow inmate down while another inmate strangled him to death); *United States v. Salim,* 287 F. Supp.2d 250, 309 (S.D.N.Y. 2003) (physical restraint enhancement applied when incarcerated defendant held down officer during attack, took officer's handcuffs and attached to his wrist after stabbing him and locked him in a cell after inflicting life-threatening injuries*) upheld United States v. Salim*, 549 F.3d 67, 76 (2nd Cir. 2008); *United States v. Cavendar*, 228 F.3d 792, 802 (7th Cir. 2000) (physical restraint enhancement applied when codefendants bound victim with duct tape while robbing them of narcotics); *United States v. Cross*, 121 F.3d 234 (6th Cir. 1997) (physical restraint enhancement applied when defendant locked up victim, held him down and tortured him, spending hours burning victim with hot scissors, pouring alcohol on his wounds and forcing him to eat dog feces). *United States v. Johnson*, 492 F.3d 254, 257 (4th Cir. 2007) (defendant's "act of gripping the victim's arms and holding her down while [other defendant] raped her is sufficiently akin to the definition's examples (being tied, bound, or locked up) to constitute forcible restraint"); *United States v. Keller*, 413 F.3d 706, 709 (8th Cir. 2005) (physical restraint enhancement applied when victim tied to a lawn chair and locked in closed for three to four days); *United States v. Kime*, 99 F.3d 870, 886 (8th Cir. 1996) (physical restraint enhancement applied when defendants pulled victim into back of van, beat him severely, held gun to his head while attempting to cut his finger off); *United States v. Long Turkey*, 342 F.3d

856, 859 (8th Cir. 2003) (physical restraint enhancement applied when defendant held victim down by her arms and hair and pinned her beneath him during intercourse); *United States v. Dock*, 293 F.Supp.2d 704, 714 (physical restraint enhancement applied in RICO case involving alien smuggling resulting in death when defendants locked three victims inside trailer and abandoned them there after others had escaped, resulting in their deaths).

The enhancement is also applied in cases where police officers have lawfully restrained an individual and then proceeded to use unreasonable force or beat an individual. *See, e.g., United States v. Clayton*, 172 F.3d 347 (5th Cir. 1999) (physical restraint enhancement appropriate for officer who violated civil rights of woman by kicking her in the head while she was handcuffed); *United States v. Evans*, 85 F.3d 617 (4th Cir. 1966) (Table, Text at 1996 WL 233056) (physical restraint enhancement appropriate even if restraint was itself lawful); *United States v. Dautovic*, 763 F.3d 927, 930 (8th Cir. 2014) (physical restraint enhancement appropriate for officer who beat detainee while handcuffed on the ground with officer's knee on his neck applying pressure).

Application of U.S.S.G §3A1.3 is a fact sensitive analysis and one that must recognize that assaultive conduct almost always involves some level of restraint. The plain meaning of "restraint" is "a measure or condition that keeps someone or something under control or within limits." [2] Coupled with the requirement that the

---

[2]
https://www.google.com/search?q=definition+of+restraint&rlz=1C1RXQR_enUS1001US1003&oq=def

restraint be physical, i.e., "relating to the body as opposed to the mind"[3], the adjustment should be applied only when one uses physical force to keep someone under control or within limits. "Keep" in this context means to "cause to continue in a specified condition" which implies a requirement that the action taken cannot be merely a momentary or transient act.[4]  The enhancement by its plain words suggests something more than a very brief holding, and the cases cited by the government for broad, generalized principles do not suggest otherwise. None of the cases cited by the government suggest a three second grab is sufficient to warrant the enhancement.

The government places much emphasis on the Court's analysis in *United States v. Bell*, 947 F.3d 49 (3rd Cir. 2020). But in *Bell*, the Court specifically recognized a durational requirement to impose the enhancement, noting "all of the examples of physical restraint listed in U.S.S.G. § 1B1.1 – being tied, bound, or

---

inition+of+&aqs=chrome.1.69i59l2j69i57j0i512j0i433i512l4j0i512j0i433i512.12095j0j4&sourceid=chrome&ie=UTF-8.

[3]
https://www.google.com/search?q=definition+of+physical&rlz=1C1RXQR_enUS1001US1003&ei=9qD_Y_7_A-Sg5NoPxNGM6AM&oq=definition+of+physical&gs_lcp=Cgxnd3Mtd2l6LXNlcnAQARgDMgUIABCABDIFCAAQgAQyBQgAEIAEMggIABCABBCxAzIFCAAQgAQyBQgAEIAEMgUIABCABDIFCAAQgAQyBQgAEIAEMgUIABCABDoKCAAQRxDWBBCwAzoHCAAQsAMQQzoFCAAQkQI6CwgAEIAEELEDEIMBOgwIABCRAhBGEPkBGAFKBAhBGABQowdY3BBgviZoAXAAeACAAT-IAZ4DkgEBOJgBAKABAcgBCsABAdoBBggBEAEYEw&sclient=gws-wiz-serp.

[4]
https://www.google.com/search?q=definition+of+keep&rlz=1C1RXQR_enUS1001US1003&ei=cKH_Y-CPCqmu5NoP6OGq2A8&oq=definition+of+keep&gs_lcp=Cgxnd3Mtd2l6LXNlcnAQARgAMgUIABCABDIFCAAQgAQyBQgAEIAEMgUIABCABDIFCAAQgAQyBQgAEIAEMgUIABCABDIMCAAQgAQQRhD5ARgDOgoIABBHENYEELADOgcIABCwAxBDOg0IABDkAhDWBBCwAxgBOg8ILhDUAhDIAxCwAxBDGAI6BAgAEEM6CwgAEEMQRhD5ARgDOggIABCABBCxAzoLCAAQgAQQsQMQgwE6BQgAEJECOggIABCxAxCRAjoMCAAQkQIQRhD5ARgDSgQIQRgAUO6aBFicsgRgkcQEaANwAXgAgAFciAH5BZIBAjEyEymAEAoAEByAERwAEB2gEGCAEQARgJ2gEGCAIQARgI2gEGCAMQARgT&sclient=gws-wiz-serp.

locked up – imply more than a momentary restraint." *Id*. at 59. The Court noted, "the few seconds during which the employee was on the floor" was **not** sufficient to invoke the enhancement, holding "the restraint has to last for some period of time greater than a few seconds." *Id*. at 59-60, fn 7.

By contrast, the application of the physical restraint enhancement was found to be appropriate in a manslaughter case when a group of individuals beat a victim incessantly, stomping on his head, chased and tackled him as he tried to escape, in a beating that lasted over the course of an hour, after which he was dragged to an abandoned house and his throat slit and his body covered by an iron stove. *United States v. Checora*, 175 F.2d 782, 790-92 (10th Cir. 1999). In that case, the district court found the dragging of the victim to the abandoned home and the covering of him with the stove to be the physical restraint. On appeal, the Circuit found the application of the restraint enhancement appropriate *on alternative grounds*, i.e., the chasing and tackling the victim to the ground to prevent his escape during the beating. While the Court noted that the "brief" encounter was sufficient, the facts of that case make it clear the encounter was anything but brief.

In the end, the primary reason not to apply the enhancement for physical restraint in this case is that the brevity of any action that could warrant the enhancement demonstrates that it is not within the heartland of the cases warranting a greater punishment than would be warranted without the enhancement. "[A]n underlying consideration in applying the guideline is that the physical restraint of a victim during an assault is an aggravating factor that

intensifies the willfulness, the inexcusableness and reprehensibleness of the crime and hence increases the culpability of the defendant." *Clayton* at 353. "[C]ases holding that a defendant physically restrained his victims usually involve a sustained focus on the restrained person that lasts long enough" to effectuate the crime. *United States v. Parker*, 241 F.3d 1114, 1118-19 (9th Cir. 2001). The Court in *Parker,* using a "sustained focus" standard, found that while there was "little question that the victim's mobility was restricted when she was made to lie down on the floor," "Congress meant for something more than briefly pointing a gun at a victim and commanding her once to get down to constitute physical restraint." *Id*. Se*e also United States v. Crawford,* 196 Fed. Appx. 572 (9th Cir. 2006) (unpublished) (applying sustained focus approach, physical restraint enhancement appropriate when defendant put gun at victim's back, forced victim to turn around, put his hands up and face a wall); *United States v. Coleman*, 664 F.3d 1047, 1050 (6th Cir. 2012) (restraint found when conduct lasted long enough to require victim to go to and remain in a separate location at gunpoint); *United States v. Copenhaver*, 185 F.3d 178, 182 (3d Cir. 1999) (physical restraint enhancement warranted when victim was forced into another office and placed in a fireplace with a screen across it at gunpoint and with threats of death); *United States v. DeLuca*, 137 F.3d 24, 39 (1st Cir. 1998) (physical restraint enhancement applied when, during assault, one defendant pushed victim as he attempted to leave and another defendant barred his egress while he was being assaulted and extorted); *United States v. Devine*, 48 Fed.Appx. 249 (9th Cir. 2002) (unpublished) (physical restraint enhancement

applied in sexual abuse of a minor case when evidence was that victim was restrained on at least one occasion by force while having intercourse against her will; holding her arms down, against her will made the act more severe than an act of intercourse that did not involve holding down her arms).

The brevity of the restraining action matters in that it relates to whether the action is *of the same nature* as the actions identified in the enhancement. In *Foppe,* for example, while the court noted that an enhancement for physical restraint does not differentiate from long-term or short term restraint, the bank robber in that case grabbed the victim by the neck, shoved an object that felt like a gun into her back, "kicked the chair out from underneath her and dragged her by the neck toward a gate that led to the teller station." *See United States v. Foppe*, 993 F.2d 1444, 1448, 1452 (9th Cir. 1993). These actions obviously took more than mere seconds, and were not of the transitory nature that Mr. Barnhart's actions were.

A comparable enhancement for restraint of victim in robbery cases under U.S.S.G §2B3.1(b)(4) exists for when "any person was physically restrained to facilitate commission of the offense." This enhancement relies upon the same definition of "physical restraint" and has been inconsistently applied with some courts finding the use of a weapon to restrict movement sufficient and others finding something more is required. *Compare United States v. Doubet*, 969 F.2d 341, 346 (7th Cir. 1992) (physical restraint enhancement warranted when victims were forced into restroom at bank at gunpoint with threats of an accomplice guarding door and at gunpoint); *United States v. DiMache*, 665 F.3d 603, 605-06 (4th Cir.

2011) (physical restraint enhancement applied when defendant ordered 2 bank tellers to the floor at gunpoint during bank robbery, when district court found that the gun was effectively used to restrain them akin to duct tape or rope); *United States v. Miera*,  539 F.3d 1232, 1234-36 (10th Cir. 2008) *with United States v. Parker*, 241 F.3d 1114 (9th Cir. 2001) (pointing gun at teller and ordering her to the ground was not physical restraint); *United States v. Garcia*, 857 F.3d 708 (5th Cir. 2017) (pointing firearm and directing victim to ground while standing guard at door not physical restraint); *United States v. Herman*, 930 F.3d 872 (7th Cir. 2019) (more than pointing gun and ordering not to move is required for physical restraint enhancement to apply); *United States v. Taylor*, 961 F.3d 68 (2nd Cir. 2020)(directing employees to back room during robbery at gunpoint not sufficient for physical restraint enhancement to apply).

The only two January 6 cases (3 individuals) where the enhancement for the physical restraint of a victim has been applied, even if correct, do not compel a different result as the facts of those cases were more egregious. In *United States v. Webster*, 21-cr-208 (APM), the government noted that Webster broke through the metal barricade and charged toward the officer. He lunged at him, tackled him to the ground, dragged him by his helmet, and assaulted him for about 10 seconds. He pinned him to the ground and straddled him while trying to forcibly remove his face shield and gas mask, causing tear gas to become trapped inside his mask.[5] While 10

---

[5] See 21-cr-208 (APM), ECF 1, Statement of Facts in Support of Criminal Complaint, pgs 6-8 and ECF 104, Government Sentencing Memo pgs 22-24.

seconds may seem brief, it is more than three times longer than Mr. Barnhart's actions and the specific actions Mr. Webster took were far more akin to tying, binding or locking up the officer.

Similarly, in *United States v. Albuquerque Head* and *Kyle Young*, 21-cr-291(ABJ), Mr. Head wrapped his arm around the officer's neck and pulled him into the crowd yelling, "I got one." He continued to restrain the officer while another person applied a taser to the back of the officer's head. While the officer ultimately freed himself from Mr. Head's grip, Head maintained his hold of the officer for at least 25 seconds, more than 8 times longer than Mr. Barnhart's actions.[6] And he didn't stop – he continued to try to reach that same officer to reengage. In that same case, Mr. Young, Mr. Head's codefendant, held the officer's left wrist and pulled his arm away from his body. He restrained the officer's left arm while another person restrained his right arm, and while another codefendant forcibly removed the officer's badge and police radio.[7]

Tellingly, there have been other cases where the government could have argued for a restraint of victim under the same theory they espouse here, and yet did not. *See e.g.*, *United States v. Fairlamb*, 21-cr-120 (RCL) (the defendant "inserts himself into the middle of their line, cutting off MPD Officer Z.B. [then] shoving Officer Z.B. so hard that he falls into a line of watching rioters" then punches him in

---

[6] See 21-cr-291-2 (ABJ) ECF 124, Statement of Offense, p. 4 and ECF 159, Government Sentencing Memo, pp. 3 and 22-26.

[7] See 21-cr-291-3 (ABJ) ECF 120, Statement of Offense, p. 4 and ECF 140, Government Sentencing Memo, pgs. 2-3 and 27-29.

the face); *United States v. Kevin Creek*, 21-cr-645 (DLF) (defendant grabbed Officer JCM driving him back forcefully before letting him go); *United States v. Byerly*, 21-cr-257 (RDM), (defendant "grabbed the victim with both hands near the victim's shoulder and upper chest and pushed him backward . .  then pushed and dragged the victim past the site of the original altercation. . ."); *United States v. Sandlin*, 21-cr-88 (DLF) (defendant attempted to rip off one officer's helmet).

In light of all of these considerations, the Court should not apply the enhancement in this case.

### B. While Other Enhancements Apply, the Degree to which they Modify His Sentence Given the Facts of his Offense Conduct Warrant a Variance

#### 1. Bodily Injury

While Mr. Barnhart acknowledged in his plea agreement that bodily injury resulted (i.e., scrapes and bruises) and that the official victim enhancement also applies, it is important to note that Mr. Barnhart did not personally cause significant injuries to any officer. He acknowledges that he was complicit in the actions that caused injuries and he accepts responsibility for his actions. However, it is important to address the extent to which his actions caused "bodily injury" which is defined in U.S.S.G 1B1.1 application note B as "any significant injury; e.g., an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought."

During his FBI interview on 4/22/2022, Officer B.M. described his injuries as bruises (most notably on his legs), scratches, and soreness; and implied that these injuries were sustained by Mr. Barnhart's co-defendants:

> [B.M.] agreed the level of soreness he experienced was to be expected after having been beaten with a metal pipe."[8]

Of note, Mr. Barnhart did not participate in beating Officer B.M. with a metal pipe (or with any object). Defendant Whitton struck Officer B.M. with a crutch; Stager beat him with a flagpole, and Courson struck him with a baton.[9] The only specific mention of injuries with direct connection to Mr. Barnhart's actions were "small scratches, possibly on his knees from when he was dragged down the steps at the USCB."[10]

During his FBI interview on 1/12/2021, Officer B.M. recalled experiencing pressure on his neck, but this was described as having occurred after he was already down the stairs which indisputably did not involve Mr. Barnhart:

> Individuals in the mob of rioters tried to pull off [B.M.'s] helmet, however the helmet was hooked to his gas mask and under his chin, so instead of removing the helmet, this act of pulling put significant pressure on [B.M.'s] neck.[11]

On 4/22/2023, Officer B.M. reported no serious injuries to his neck:

> [B.M.] could not remember any serious injury being sustained to his neck.[12]

---

[8] [U_Interview_of_MPD_Officer__B.M.] at ¶5.
[9] Gov't Sentencing Memorandum for Justin Jersey, pp.13-14. (ECF 275)
[10] [U_Interview_of_MPD_Officer__B.M.] at ¶4.
[11] [0176-DE-3374126_0000041] at ¶3
[12] [U_Interview_of_MPD_Officer_Blake_B.M.] at ¶4

Officer B.M.'s injuries were not significant enough to keep him from returning to the front lines shortly after the incident. B.M. relayed this to the FBI when he was interviewed on 1/12/2021 and again during his interview on 4/22/2022. He described returning to the CD unit, telling his Lieutenant he was fine, regrouping with colleagues at the rear of the tunnel, and then joining the front lines to push protestors out of the area to secure the perimeter.[13]

Following the events of January 6th, Officer B.M. visited a doctor one time. During his FBI interview on 4/22/2022, he stated that he did not receive any specific treatment, and was not in need of pain medication or even ice.

> [B.M.] was not prescribed any medication or creams for his injuries. [B.M.] did not seek medical treatment elsewhere for his injuries. [B.M.] did not recall using ice or taking any painkillers for the injuries.[14]

Interview notes imply that Officer B.M. likely only visited a doctor because it was required by MPD's APO policy.

> [B.M.] recalled being checked-out by a doctor either a day after January 6, or the next day. [B.M.] was sure he got checked-out within the week. MPD's Assault on a Police Officer (APO) policy required [B.M.] to go to the hospital to get checked-out after incidents such as the one which occurred on January 6. [B.M.] did not believe he went back again for medical treatment for those injuries.[15]

Officer B.M. acted heroically on January 6 and Mr. Barnhart recognizes that and acknowledged in his plea agreement his remorse for his conduct by not disputing that the adjustment to his guidelines calculation is appropriate. These points are made only to demonstrate that a variance would be appropriate.

---

[13] [0176-DE-3374126_0000041] at ¶9; and [U_Interview_of_MPD_Officer__B.M.] at ¶7.
[14] [U_Interview_of_MPD_Officer__B.M.] at ¶6.
[15] [U_Interview_of_MPD_Officer__B.M.] at ¶6.

Although Mr. Barnhart is grateful that Officer B.M. only suffered minor injury, he is no less regretful for his actions. He is ashamed of his part in the assault to Officer B.M, regardless of injury level, and he fully understands that the outcome could have been far worse. Mr. Barnhart only asks that Court consider the actual level of physical injury to B.M. when deciding his sentence.

### 2. Official Victim

With Mr. Barnhart's agreement, a 6 level enhancement has been applied pursuant to U.S.S.G § 3A1.2 because the victim was a government official. Here too, consideration of a variance is appropriate because that enhancement typically applies when there is an animus towards a government official. Mr. Barnhart was not predisposed to be motivated by the officer's status but acted out of rage induced by the mob mentality that ensued.

The applicable guideline provides in full: (Apply the greatest):

(a) If (1) the victim was (A) a government officer or employee; (B) a former government officer or employee; or (C) a member of the immediate family of a person described in subdivision (A) or (B); and (2) the *offense of conviction was motivated by such status*, increase by 3 levels;

(b) If subsection (a)(1) and (2) apply, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offense Against the Person), increase by 6 levels.

(c) If, in a manner creating a substantial risk of serious bodily injury, the defendant or a person for whose conduct the defendant is otherwise accountable – (1) knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense or immediate flight therefrom; or (2) knowing or having reasonable cause to believe that a person was a prison official, assaulted such official while the defendant (or a person for whose conduct the defendant is otherwise accountable) was in the custody or control of a prison or other correctional facility, increase by 6 levels. U.S.S.G § 3A1.2. (*Italics added*)

In the commentary, the Commission explains in pertinent part that "motivated by such status," means that the offense of conviction was motivated by the fact that the victim was a government officer or employee. *Id.* cmt. n.3. The Commission goes on to provide an example "where both the defendant and the victim were employed by the same government agency and the offense was motivated by a personal dispute." *Id.*

Again, we do not dispute that the enhancement is appropriately applied here, as agreed to in the plea agreement, but note that because a 6 level increase is dramatic, and its application in this case over emphasizes the importance of the victim's status in the actions taken, a variance is warranted.

### 3.  Use of a Dangerous Weapon

Finally, as noted in the sentencing disparity section at the end of this perhaps interminably long sentencing memorandum, the definition of a dangerous weapon has been less than uniformly applied in these cases, leading to sentencing disparities. In the statement of offense, Mr. Barnhart acknowledged that he struck at a line of officers (not Officers AW and BM) with the base of a flagpole and he does not retract that acknowledgement. However, similar and even far more egregious conduct has often led to 111(a) rather than 111(b) charges as noted below. *See e.g. United States v. Sargant*, 21-cr-258 (TFH); *United States v. Leffingwell*, 21-cr-5 (ABJ); *United States v. Wilson*, 21-cr-345 (RCL); *United States v. Creek*, 21-cr-645 (DLF); *United States v. Miller*, 21-cr-75 (RDM); *United States v. Mattice and Mault*, 21-cr-657); *United States v. Richardson*, 21-cr-721 (CKK); *United States v. Wilden*,

21-cr-423 (RC); *United States v. Neefe*, 21-cr-567 (RCL); *United States v. Smith*, 21-cr-567 (RCL); *United States v. Sandlin*, 21-cr-88 (DLF); *United States v. Hernandez*, 22-cr-42 (CRC); *United States v. Judd*, 21-cr-40 (TNM). (See description of offense conduct in Section IV. D. below.)

Mr. Barnhart agreed as part of his plea agreement that these enhancements, with the exception of "physical restraint," apply, but submits that on the facts of his particular conduct, a variance would be appropriate. Regardless of the guideline range this Court calculates, Mr. Barnhart through counsel, respectfully submits that, consistent with the principle articulated by the Supreme Court that "the punishment should fit the offender and not merely the crime," *Pepper v. United States*, 562 U.S. 476, 477 (2011), this Court should impose a sentence well below the guidelines, followed by a period of supervised release with those conditions the Court sees fit to impose.

## IV.   Application of the Sentencing Factors

### A. Mr. Barnhart's history and characteristics demonstrate that a below guidelines sentence is appropriate.

#### 1. Mr. Barnhart's life is centered around family

Logan James Barnhart, now 42 years old, was born and raised in Lansing, Michigan.  He is the younger of two children by his mother Connie Barnhart and his father Lloyd Barnhart; and he has two paternal half-sisters. Logan has always had a strong relationship with his mother and sisters, as well as with his extended family, many of whom live in Michigan and see Logan often.  Although Logan had a

difficult and complicated relationship with his father for most of his life, the two have become very close in recent years – particularly since his arrest following January 6th.  Growing up and to this day, Logan values family over everything.  He is adored by everyone in both his immediate and extended family, including his niece, nephew, and godson; and he hopes to have children and a family of his own one day.  In the meantime, Logan spends as much time as possible with his sister Christy's two children.



*Logan with his sister, nephew and mother*

Letters written by Logan's family, people who have known him their entire lives and in an entirely different context than the unique and limited events of January 6th, show that his acts that day were an aberration for someone widely known to be thoughtful and empathetic towards others.

Logan was chosen by his cousin Courtney to be the godfather to his son Odin. Courtney has trusted Logan to rear his child in the event of his passing, which is a decision not made lightly. Even now - knowing the details of Logan's participation in the events of January 6th - Courtney is undeterred in his choice which is demonstrated in his heartfelt letter to the Court.[16]

Logan's mother speaks of Logan's devotion to his family and his willingness to help, both before and after his arrest.  She includes examples of Logan planting flowers for her and helping his father to shovel snow.  After he was confined to the indoors and could no longer do outdoor activities, Logan began cooking for his parents.  His mother shares stories of Logan rescuing injured animals as a boy… a testament to his kindness and sense of empathy. [17]

### 2. Mr. Barnhart is a dedicated employee with a strong work ethic

Logan graduated from Haslett High school in Lansing, Michigan in 1999. He then attended Northern Michigan University from 2001 to 2003 and Saginaw Valley State University from 2004 to 2006.  Logan played football while attending both universities while also taking college courses with a focus on Kinesiology.  In 2006, Logan was signed on with an international football team in Germany.  He withdrew from college so that he could move to Germany and pursue the next exciting chapter in his life. But unfortunately this was not to be, as Logan suffered a career-ending knee injury just before he had planned to move overseas.  This turn

---

[16] Letter to the Court from Courtney Valentine [Exhibit 2, pp.13-14]
[17] Letter to the Court from Connie Barnhart [Exhibit 2, pp.3-4]

of events was devastating to Logan, and it led to a period of depression and alcohol use.

After recovering from ACL surgery and in the years following, Logan became increasingly active and interested in physical fitness. As he turned to focusing on a healthy lifestyle, he stopped using alcohol and he pulled himself out of depression. In 2015, he moved to Las Vegas, Nevada and became a personal trainer for The City Athletic Club. Although he enjoyed his career as a trainer, the pay was not sustainable, so he eventually moved back to Michigan. But, even after leaving personal training, Logan continued to live a clean and healthy lifestyle and kept physical fitness at the forefront. He became an inspiration to his friends and family and used his skills and knowledge to motivate and encourage others to reach their personal weight loss goals by offering free training sessions at the gym. Letters from friends and family describe how Logan made significant and life-changing impacts on their lives.[18]

Since being on home detention, Logan has not been able to visit the gym or even take walks around the neighborhood. As someone who was previously so active and dedicated to fitness, the sudden inability to exercise has taken a physical and mental toll on Logan. Although he has not returned to drinking, a drastically more sedentary lifestyle has been one of the many factors contributing to the depression that he's struggled with since his arrest.

---

[18] Letters to the Court [Exhibit 2]

After moving back to Michigan, Logan worked as a pipelayer for Dan Hoe Excavating from 2016 to 2017. He then went to work for his father's company Barnhart & Sons in Holt, Michigan where he had also worked intermittently in the years past. Due to the then tumultuous relationship between himself and his father, Logan quit and began working as a heavy machine operator for MacKenzie Companies through 2020.  However, weather and frozen conditions during the Michigan winters meant that MacKenzie Companies had to lay off employees on a seasonal basis.  So, during these times of unemployment, Logan went back to work for his father's company. In short, Logan made every effort possible to remain employed and work hard, even when it meant that he had to swallow his pride.

In April 2021, Logan found a new opportunity at a Dunigan Brothers, Inc., a construction company in Jackson, Michigan. This is where Logan is currently employed today. His foreman and co-workers have written a letter to the Court attesting to Logan's special skills, work ethic, and positive attitude. Logan was fortunate not to lose his job over the charges against him related to January 6th. The fact that his employer kept him on - despite his inflexible availability due to the strict conditions of his home detention -  and then wrote a letter to the Court, demonstrates just how much the company trusts him, believes in him, and depends on him.[19]

### 3.  Mr. Barnhart has no significant criminal history and no criminal history points

---

[19] Letter to the Court from Dunigan Bros., Inc. [Exhibit 2, p.2]

Mr. Barnhart has three prior convictions, all misdemeanors and none of which are scored. He is in a criminal history category 1 and for good reason. While the prior convictions demonstrate lack of judgement, they do not demonstrate a likelihood of recidivism or further violence. First, when Logan was 18 years old and still in high school, an upset between Michigan State University and Duke University, a key rival team in the playoffs resulted in fans becoming rowdy which eventually led to a protest over the city's then recent decision to ban tailgating at the stadium. The protest led to a riot.  Logan was not at the basketball game, he was not part of the protest, nor was he there when the riot began.  In fact, he didn't even have an opinion about the tailgating ban.  He and his friends had been at home watching the game on television.  When they saw the riot coverage on the local news, excitement grew amongst them over the idea of something like this happening in their otherwise normally quiet town.  They then made the impulsive and juvenile decision to go and see what was happening.  Once at the stadium parking lot, they engaged in inappropriate behavior. Logan recalls that his actions were inexcusable, but noted that he did not actually jump on a car as was erroneously stated in the police report (this particular action was that of his friend, and the correction was verbally agreed upon by the investigating officer). Logan pleaded guilty to Unlawful Assembly. He served 45 day in jail, 24 months of probation, and paid a $5,500.00 fine. This matter was then dismissed under the HYTA [Holmes Youthful Trainee Act] and was expunged from his record.  Mr.

Barnhart hopes that the Court will see this for what it was – an impulsive and stupid teenage decision for which he served his punishment.

In 2010, when Logan was 29 years old, he had an unfortunate run-in with another driver who had previous incidents of road rage. Logan recalls that the other driver instigated the event and also escalated the incident by parking his car and running towards him. Rather than threatening to use his firearm (for which he was licensed to carry, and was on his person legally), Logan defended himself by punching the other driver.  Logan pleaded guilty to the misdemeanor of Brandishing a Firearm in Public and the Assault and Battery charge was dismissed. He served 5 days in jail, 9 months of probation, and paid a fine of $920.00.  Finally, he has a conviction for driving under the influence, also a misdemeanor.

As noted, Mr. Barnhart is in criminal history category 1 and has no prior felony convictions. The scattered misdemeanors in his past (one of which was cleared from his record) do not exemplify a history of violent behavior. Moreover, his exemplary performance on release in this case for nearly two years demonstrates that he can and will be a law abiding individual in the future.

## B. The nature and circumstances of the offense are serious but do not warrant the sentence the government requests.

Mr. Barnhart did not know any of his co-defendants, nor was he affiliated with any groups or individuals which would tie him to them.  He did not coordinate with them or plan an assault with them. The co-defendants in this case differ from

Mr. Barnhart in many ways, most notably in their actions on January 6, as described by the government, and specifically the egregiousness of their assault on law enforcement. Mr. Barnhart's actions while indefensible were less egregious than those of his co-defendants. The Government's descriptions of events, particularly the assault at the archway, implies culpability by one individual based on the actions of all of them. The prosecution has failed to cite the evidence which makes the appropriate distinctions in differentiating these individuals. The facts outlined below better illustrate Mr. Barnhart's specific role:

### 1.  Planning for January 6th, 2021

After the 2020 Presidential election, former President Trump, members of his inner circle, and some members of the media began circulating the word that the election was "stolen." The false claims spread on media—from local news outlets, to Facebook, to some national broadcasts—that the election had been corrupted. Hearing these reports, many of Trump's supporters, including Mr. Barnhart, became concerned. He believed—because of what the President and other prominent politicians and media figures were saying—that the democratic process had been undermined by fraud. When President Trump started advertising the "Stop the Steal" rally, Mr. Barnhart decided to travel to Washington, D.C., to support the President and to protest against election irregularities. That was it. Mr. Barnhart felt it was his patriotic duty to support the President and to advocate against election fraud by being physically present at the rally.

Mr. Barnhart invited his mother, who was then 70 years old, to accompany him to the District of Columbia so they could attend the rally together.  His mother

had wanted to go along, but due to scheduling conflicts she was unable to join him.

If Mr. Barnhart had been planning to participate in illegal activity, or anything of a

riotous nature, he never would have invited his 70 year old mother to accompany

him.  This is attested to by Mr. Barnhart's mother, Connie Barnhart, in her letter to

the Court:

> *"He would not have asked me to go if he was planning anything besides*
>
> *watching the President speak."*[20]

After viewing Trump's Twitter announcements and learning the location of the

rally, Mr. Barnhart booked an AirBnb and planned a walking route from his

accommodation to the Ellipse. He was never planning on visiting the US Capitol

Building. Phone data shows that he never mapped a route to the actual building. Mr.

Barnhart's only intent was to hear Trump speak.



[Screenshots from Barnhart's mobile device]

On January 5, 2021, Mr. Barnhart traveled alone by car from his home in

Michigan to Washington D.C. He did not bring weapons or tactical gear of any kind,

He did not anticipate violence.  By contrast, co-defendant Justin Jersey exchanged

---

[20] Letter to the Court from Connie Barnhart [Exhibit 2, pp.3-4]

Facebook messages which indicated he anticipated violence[21]; and defendant Michael Lopatic replied to a social media post regarding January 6th that it was "time to lock and load."[22]

### 2. Actions on January 6th, 2021

Mr. Barnhart arrived early the morning of the rally and was in a good position to hear the speeches, including the President's. He wore regular civilian clothing. By contrast, co-defendant Jeffrey Sabol wore a helmet and "hard gloves" and carried a backpack which contained a knife and zip ties, while co-defendant Ronald McAbee wore a tactical vest and "reinforced or black brass knuckle gloves."[23]

Mr. Barnhart was energized by the speeches and the crowd around him. He heard Mr. Trump's call to meet him at the Capitol to have their voices heard in order to "save our democracy." Mr. Trump also told his followers that "they wanted to re-certify the votes," and the only way to do that would be to have "Mike Pence send it back." He also warned that if Mike Pence did not send it back, America would have an "illegitimate president."

Mr. Barnhart left the Ellipse shortly after Trump finished speaking at 1:11pm.  He knew that the crowd was heading to the Capitol, but he was not in a hurry to join them. Mr. Barnhart had no plans to disrupt a vote count or to cause any trouble. In his mind, the walk to the Capitol was simply an extension of the

---

[21] Government Sentencing Memorandum for Justin Jersey, pp.6-7 (ECF 275).
[22] GJ Transcript [Ex 25C - 2021-R-00367.08-04-21.KB], p.46.
    [23] GJ Transcript [Ex 25C - 2021-R-00367.08-04-21.KB], pp.5-6; p.14; p.26

rally and a way to continue showing his support for the former President. Rather than rushing straight to the Capitol, as many others did, Mr. Barnhart walked around DC looking for a place to purchase drinking water. At 2:04pm, almost an hour after leaving the Ellipse, he was still walking and had not yet reached Capitol Grounds (left-side image below shows Mr. Barnhart at the corner of Madison and 3rd at approximately 2:04pm). Meanwhile, unbeknownst to Mr. Barnhart, the entire west front lawn of the Capitol had already been breached by the wave of protestors that had arrived before him. At that time, officers were attempting to hold the front line nearer to the building and were being met with violence by at least one of Mr. Barnhart's co-defendants (right-side image below shows Jeffrey Sabol on the West front, also at 2:04pm).



*Left: Parler video referenced in Verizon Search Warrant Affidavit [089B-WF-3368293-128_AFO_0000109_1A0000107_0000001]. Right: BWC of Officer J.M.*

Mr. Barnhart then walked to the west side of the reflecting pool where he sat on the steps for approximately 33 minutes. He was still not on official Capitol grounds. At this time, the west front was being further breached by protestors (including but not necessarily limited to co-defendants Sabol who again charged the front line at 2:27pm and McAbee who claimed to have been hit by a rubber bullet

likely on or around this same time[24]).  From Mr. Barnhart's distanced position, he was unaware of any violence taking place (orange arrow in left-side image below shows Mr. Barnhart's approximate location at the reflecting pool at 2:28pm while the right side image shows the breach just below the Lower West Terrace at approximately the same time).



*Left: 0514 USCS RF Capitol West Front - 2021-01-06_19h14min28s.mp4*
*Right: 0944 USCS RF West Roof - 2021-01-06_19h24min25s.mp4*

Mr. Barnhart left the reflecting pool and officially arrived on the grounds of the Capitol at 2:37pm on the southwest side by walking through the roundabout at Garfield Circle.  The only visible barricades were bike racks surrounding the monument to keep people off that specific section of grass. There were no barricades blocking the sidewalk to the Capitol and no signs remained to indicate that Capitol grounds were restricted. Law enforcement was not present. Images below show Mr. Barnhart at Garfield Circle (left), and rooftop CCTV at 2:37pm with arrow showing this approximate location (right).

---

[24] GJ Transcript [Ex 25C - 2021-R-00367.08-04-21.KB], pp.42-43; McAbee FBI interview [089B-KX-3474864_0000032], p.3



*Left: [0684 USCG 00 SW Drive Exit - 2021-01-06_19h31min53s.mp4] [05:55]*
*Right: 0514 USCS RF Capitol West Front - 2021-01-06_19h34min28s.mp4 [03:19]*

Mr. Barnhart stood in the crowd on the west front and eventually walked up to the Lower West Terrace [LWT] at around 3:02 p.m. The left image below shows Mr. Barnhart amongst the crowd as he began moving to the LWT while the right image shows a zoomed-in enlargement.



*0682USCG00WestFrontSouth_2021-01-06_14h59min47s830ms.mp4 [02:35]*

When Mr. Barnhart arrived at the LWT, a massive crowd had already gathered, which is apparent from CCTV images below (showing the LWT at approx. 3:05pm just after he arrived). This evidence directly contradicts the Government's

statement that "Mr. Barnhart and his co-defendants were some of the first assailants on the LWT to start what became a prolonged, multi-attack on police officers."[25]  Although at least some (and possibly all) of the co-defendants were already on the LWT, this statement simply does not apply to Mr. Barnhart



*0943 USCH RF West Roof - 2021-01-06_19h57min48s.mp4 [07:08]*

Once on the LWT, Mr. Barnhart stood amongst the crowd in the area south of the tunnel archway. He was close enough to witness others engaging with police at the tunnel, but he observed at a distance and did not approach. While standing in the crowd, Mr. Barnhart was surprised to see Trump supporters engaging in violence with police at the archway. He did not approve or support what he was witnessing, and he never imaged that he would be joining them. At least one of Mr. Barnhart's co-defendants (Mason Courson at 3:16 p.m.) was already engaging with

---

[25] Page 26 of Government Sentencing Memorandum for Logan Barnhart (ECF 284)

law enforcement by pushing and shoving his way inside the tunnel and grabbing at officers' riot shields. [26]

Mr. Barnhart stood in the same general location on the LWT for approximately 80 minutes [image below shows Logan in the crowd on the LWT at approximately 4:15pm/4:16pm]. This is an important distinction as it again disproves the statement that Mr. Barnhart was one of the first assailants to start the assault on officers.  It also shows that Mr. Barnhart had every opportunity to approach the archway during this 80 minutes, but he did not. During this time, he did nothing more than watch.  He did not throw anything (nor was he even close enough to do so), he did not encourage others by gesturing, and to his recollection he never even joined in on the various chanting and singing that was taking place around him. Due to the violence, which he could see from where he was standing, he actually considered leaving, and he genuinely wishes that he had. But like so many others in the crowd Mr. Barnhart felt that he was witnessing an historic event.

---

[26] GJ Transcript [Sabol et al_Deutsch_11-03-21_Kearney-Moeder], pp.4-10



*[LWT video, 4:10] [05:27]*

At around 4:22 p.m., a large group of protestors was pushed out of the tunnel. Some were trampled and injured as they fell down the stairs. One person in particular, Roseanne Boyland, had stopped breathing and was being administered CPR by those around her. Word quickly spread that a person was dying on the steps. Many protestors were shouting that the police had killed someone. Of note, the protestors were wrong about the cause of death -- Ms. Boyland was not killed by the police -- but they were correct to say that someone was dying.  Sadly, Ms. Boyland was never resuscitated and she passed away sometime during the incident. When Mr. Barnhart heard the rumors and shouts from the crowd, he became concerned, upset and agitated. At 4:27 p.m, he approached the archway.

What happened next was the felony assault to which Mr. Barnhart has pleaded guilty.  Mr. Barnhart wants to be clear that he does not wish to use a

protestor's death as an excuse for his actions… and in fact, doing so would be a dishonor to Ms. Boyland.  He understands that there is nothing that would excuse his assault on a law enforcement officer and he takes full and sole responsibility for his actions. However, it was this event that caused Mr. Barnhart to decide to approach the archway. Had this event not occurred, Mr. Barnhart believes he would have remained just another observer in the crowd. And when Mr. Barnhart went forward, his intentions were not to breach the lines or to gain access to the building. In fact, Mr. Barnhart never desired to enter the building at any point on January 6th, not even while he was at the archway.

As Mr. Barnhart walked toward the archway, co-defendant Jack Whitton (who had previously been beating Officer B.M. with a crutch [27]) was the first to grab at Officer B.M. and begin dragging him out of the tunnel by the back of his neck. The image below shows Whitton (red square) initiating the assault while Mr. Barnhart (orange arrow) was only just reaching the steps.  At this moment, Mr. Barnhart was coming forward to see what was happening with the injured protestor (Ms. Boyland is indicated by blue arrow).

---

[27] Justin Jersey Government Sentencing Memorandum, pp.13-14.



*BWC, Officer C.M.*

As Mr. Barnhart climbed up the steps, he made an impulsive and terrible decision: he joined in on the incident that was transpiring before him by assisting Whitton (and then also co-defendant Sabol) in pulling Officer B.M. further down the steps. Three seconds later he abruptly released his hand from Officer B.M. and moved off to the side. Three seconds was the total of Mr. Barnhart's participation on the assault of Officer B.M. which continued for some time by others.

As Mr. Barnhart backed away, co-defendant Peter Stager repeatedly struck Officer B.M. with a flagpole; and Mason Courson beat him with a baton. At around this same time and near the top of the steps, co-defendants Ronald McAbee and Clayton Mullins were pulling on Officer A.W.'s legs, engaging in a tug-of-war with officers who were trying to pull him back in. McAbee eventually succeeded, which

42

led to Officer A.W. being kicked, struck with poles, and stomped on.[28] Officer A.W.'s injuries were serious and required hospitalization.[29] Mr. Barnhart had no part in the assault on Officer A.W., and no further participation in the assault of Officer B.M. beyond those three seconds. Images below show portions of both incidents. Mr. Barnhart is not seen in the first image; the second image shows Mr. Barnhart's head (orange arrow) and demonstrates that he was not participating in either event.



*Open Source Video: "Jan6PhoneRecovery"*

---

[28] Justin Jersey Government Sentencing Memorandum, p.14.

[29] Gov't Sentencing Memo for Justin Jersey, p.14; p.17.

At 4:28:42 p.m., Mr. Barnhart (indicated by orange circle in image below) attempted to get a better look at what was happening with Roseanne Boyland who was still lying on or near the top step. On or around this time, co-defendants were stealing helmets, police badges, and body cams. Mr. Barnhart never stole or attempted to steal any police property.



CCTV: *[0074USCHBALowerWTerraceDoorExterior_2021-01-06_16h15min38s597ms.mp4]*

As Ms. Boyland continued to receive CPR on the steps, protestors yelled loudly, "There is a man down!... He's dying!... Get this man now!" [of note, many protestors initially mistook Ms. Boyland for a man and used incorrect pronouns]. Mr. Barnhart recalls that he could clearly hear the words which were being yelled by the protestors and at one point he too pleaded, "help him, help him."



*BWC, Officer S.S.*

Shortly after, Mr. Barnhart observed as others began pulling Ms. Boyland to the

entrance.



*BWC, Officer S.S.*

A crowd gathered as Ms. Boyland continued receiving chest compressions at the entrance to the archway.



*BWC, Officer S.S.*

Mr. Barnhart watched as Ms. Boyland was finally dragged into the tunnel and eventually inside the Capitol. As he stood watching, other people near the front yelled loudly at law enforcement: "This is on you, motherfuckers"… "You killed her"… "Shame on you." As noted previously, law enforcement was not actually responsible for Ms. Boyland's death (and Mr. Barnhart understands this now), but he believed what he was hearing to be true at the time. Given the noise, rumors, and a lifeless body clearly visible on the steps, there was understandably much confusion surrounding the incident and his judgement was clouded.



*BWC, Officer S.S.*

At around 4:32pm, the crowd surged forward at police once more.  Mr. Barnhart leaned in and pushed on other protestors.  He did not make direct contact with any officers.



*LWT 4:30 [02:01]*

A few seconds later, a flag was thrown at the tunnel by someone further down the steps [yellow circle in image below shows the man as he threw the flag forward], but it fell short of the tunnel and landed in front of Mr. Barnhart. Mr. Barnhart did not bring the flag into the tunnel as suggested by the government when it notes that he "approached the line of officers wielding a flagpole..."[30]



Mr. Barnhart acknowledges that he picked up the flagpole and lifted it into the air, rotated it, and then lowered it to near ground level. The Government has used the following image to show the moment that he raised the flag into the air. The image is misleading as it implies that he then used it to "strike" officers when the video is far less clear.

---

[30] Page 2 of Government Sentencing Memorandum for Logan Barnhart (ECF 284)



After lowering it toward the ground, Mr. Barnhart pushed the flagpole into the tunnel toward the officers, consistent with the description in his statement of offense that he "struck at officers" not that he struck an officer. This action is admittedly violent and is inexcusable, but it is less egregious than the suggestion that he used the flagpole in an overhead "strike." The defense poured over BWC to determine if the end of the flagpole made contact with any officers. The determination was that it most likely hit a shield and the side of the tunnel archway [images below from BWC of MPD Officer J.S. at 4:32pm]. Due to the constant movement of BWC cameras, the possibility exists that it also made contact with an officer, but if this happened, it was not found in footage. Mr. Barnhart acknowledges that it is possible the flagpole made contact with an officer while he possessed it, but he does not know that to be the case. Due to the dense crowd consisting of both officers and protestors, and various objects strewn about the ground, he could not actually tell where the end of the pole landed. However, Mr.

Barnhart admits that the possibility exists and he sincerely regrets using the flagpole in the violent manner that he did, regardless of who or what was on the receiving end, and he accepts culpability for his role in this incident. He stands by his admission that he "struck at them with the base of flagpole" but he has no clear recollection aside from what is on the video.



At 4:33pm, Mr. Barnhart abruptly dropped the flagpole and walked away from the archway. He was not forced out by police; he left by his own volition. Mr. Barnhart knew that what he had done was wrong, illegal, and unjustified. He was immediately remorseful and wanted to remove himself from the situation. Others continued fighting as he walked away.



*Left: Jan6PhoneRecovery [51:24]*
*Right: 0074USCHBALowerWTerraceDoorExterior_2021-01-06_16h15min38s597ms.mp4 [17:18]*

Mr. Barnhart's total time in the vicinity of the archway was less than six minutes, and of this, only around 50 seconds were spent engaging -- the majority of the six minutes were spent trying to ascertain what had happened to Ms. Boyland.

After walking away from the archway, Mr. Barnhart did not look back. He did not stand and observe from a distance as he had been doing before. He immediately began retracing his steps to the stairway leading to the exit of the LWT. He paused only briefly to remove his sweatshirt and tie it around his waist. He then left the LWT. [Images below show Mr. Barnhart exiting the LWT at 4:33pm, seconds after he left the archway].



*Left: 0943 USCH RF West Roof - 2021-01-06_21h26min07s.mp4 [07:52]; Image on right is zoomed-in enlargement*

At 4:39pm, Mr. Barnhart exited Capitol grounds the same way he entered, via Garfield Circle. He then made his way back to his accommodation in the Shaw neighborhood of D.C., and was inside well before the 6 p.m. curfew.



*0684 USCG 00 SW Drive Exit - 2021-01-06_21h37min12s.mp4 [02:37]*

Meanwhile, at the Capitol on the LWT, protestors continued fighting at the archway. At least one (and possibly all) of Mr. Barnhart's co-defendants remained at or in the vicinity of the tunnel.  At 4:48 p.m., Jack Whitton kicked at officers and yelled, "You're gonna die tonight.[31]"  The violence only ended at 5:06pm when Virginia State Police arrived and finally cleared the area by use of tear gas and additional law enforcement (images below are from 5:06pm, showing the LWT… Mr. Barnhart was off Capitol grounds and likely already inside his accommodation at that point).

---

[31] Jack Whitton Statement of Offense, p.4. (ECF 226)



0074USCHBALowerWTerraceDoorExterior_2021-01-06_16h55min16s573ms.mp4 [01:54]
Right: 0903 USCD LA Dome West - 2021-01-06_22h03min32s.mp4 [03:20]

Despite what the Government claims, Mr. Barnhart was not proud of his actions. He was ashamed and told nobody what he had done. Meanwhile, co-defendant Whitton sent a text to his father with a photo of his bruised hand and the following statement: "This is from a bad cop... Yeah, I fed him to the people. IDK his status and don't care TBH.[32]" Sometime that afternoon/evening and while still on Capitol grounds, co-defendant Peter Stager gave an interview to The Telegraph stating that "The entire building is filled with treasonous traitors... Every single one of those Capitol law enforcement officers... death is the only remedy...[33]" Sometime that night, co-defendant Lopatic threw Officer B.M.'s BWC (which he had stolen) into a storm drain.[34]  Justin Jersey was stealing helmets and police badges, one of which he later displayed as a trophy in a local bar near his home.[35]

---

[32] GJ Transcript [Ex 25B - Sabol_Moran 3.10.21 Kukowski], p.18
[33] GJ Materials [EX 6 - The Telegraph footage]
[34] GJ Transcript [Ex 25C - 2021-R-00367.08-04-21.KB], p.22
[35] Government Sentencing Memorandum for Justin Jersey, pp.15-16

### 3.  Actions Following January 6th, 2021

After January 6th, Mr. Barnhart continued to use social media. He read posts and news articles about January 6th which is not unusual for someone who had been there.   Mr. Barnhart found it curious that the death of Ashli Babbitt was well known, but very little had been published about Roseanne Boyland. He posted some comments that indicated that he thought something was just not right about January 6th.  He posted some comments in which he admitted he was at the Capitol. But Mr. Barnhart never posted a single thing about his actions on January 6th.  The Government's claim that "Barnhart, as demonstrated by his social media, was proud of his actions on January 6"[36] is simply untrue. Mr. Barnhart was incredibly remorseful about his actions which is the reason that he didn't post about them.

The Government has alleged that Mr. Barnhart "mocked the FBI" on social media.[37]  As evidence, they have included only a partial screenshot of a different defendant's Statement of Facts (which was re-posted and commented on by Mr. Barnhart), and thus have completely omitted the item that Mr. Barnhart was referring to (which is the portion of an Affidavit by an FBI agent who apparently unknowingly used a photo-shopped image containing a popular and arguably x-rated internet meme as evidence in the Statement of Facts. The error is clearly visible on page 4 of ECF 1 of 21-cr-125 in the portrait on the wall behind defendant Jacob Chansley, and is seen in the image below). His comment was a comment

---

[36] Page 27 of Government Sentencing Memorandum for Logan Barnhart (ECF 284)
[37] Page 15 (exhibit 8) of Government Sentencing Memorandum for Logan Barnhart (ECF 284)

about the carelessness of using an obviously photo-shopped image in an official

criminal complaint. It was nothing more.



Mr. Barnhart was remorseful for his actions from the second he left the

archway, and he continues to be remorseful today.  He has never believed that his

actions of violence were justified and he has never said or done anything to indicate

as much. Mr. Barnhart's genuine remorse and complete acceptance of responsibility

warrants a below guidelines sentence. The government seems to suggest that by not

commenting to the PSR writer other than to acknowledge the statement of offense

(an almost universal policy followed by the D.C. Office of the Federal Public

Defender in all criminal cases, and one this AFPD has followed in nearly every case

handled in her 23 year career with the office) he is not remorseful. Nothing could be

further from the truth. He did not comment on the advice of counsel that the time to

do so is at sentencing where his words will be heard directly from him, not through the lens of the PSR writer.

Mr. Barnhart has expressed his remorse and his desire to plead guilty since very early on in his case, even offering to debrief with the government while acknowledging he knew nothing more than was on the video feed as he did not come with or know any of his codefendants. While Mr. Barnhart consistently indicated a desire to plead guilty, his prior counsel and then undersigned counsel were involved in efforts to obtain a better plea offer for him – one that acknowledged his lesser culpability than many of his codefendants. Ultimately, the government declined to make such an offer and Mr. Barnhart nevertheless accepted the only plea offer the government was willing to make.

### C.   A below guidelines sentence would be sufficient to reflect the seriousness of the offense and provide just punishment, especially in light of the lengthy time Mr. Barnhart has spent on home detention.

Following his detention hearing, Mr. Barnhart was placed on home detention, which as this Court is aware, is the strictest level of supervision. A lengthy period of incarceration would be overly punitive when other methods of punishment are available.

> People are all very quick to suggest that the only real punishment is a jail sentence, and it's just not true. People can suffer in many different ways and do suffer in many different ways a result of their conduct and that is something every judge, at least on this court, I believe, understands, and takes into account when they're fashioning the appropriate sentence.[38]

---

[38] Quote from the Honorable Amit P. Mehta, *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at pg 29.

Mr. Barnhart, unlike many other January 6 defendants, has been living

under restrictive pretrial conditions for nearly two years. While it is true that

home detention is much better than pretrial incarceration, a period of home

detention of this length is punitive in nature. Moreover, a period of pretrial

incarceration would be credited towards any prison sentence imposed, while a

period of home detention is given no credit. Mr. Barnhart has not been able to

go about his life in a normal manner for the past nearly two years while

awaiting the outcome of his case, while those on pretrial release without

electronic monitoring and home detention have been. He has been restricted

to his home except for limited purposes and has missed the ability to live his

life. And he will get no credit towards any sentence imposed like those

incarcerated pending the outcome will. Surely some adjustment is

appropriate given the length of his pretrial home confinement.

For the past 20 months while on home confinement, Mr. Barnhart has

been required to submit a weekly request to his parole officer to schedule

anything outside of his home. This includes grocery shopping, specific work

hours, and even stopping to fuel his vehicle at the gas station on his way

home from work. He is required to submit this schedule a full week ahead of

when he wishes to do each thing. This has resulted in Mr. Barnhart being

forced to leave his job at an exact time each day, even if the work is not

complete and the rest of the crew must stay late to complete a project.  This

happened often, as construction work hours vary greatly depending on the

specific project and the inability to always accurately predict completion times.  Mr. Barnhart has a strong work ethic.  He repeatedly felt like he was letting his team down by leaving the job site before the crew was finished for the day, which is something that he would never do if given the choice.

### 1.    Home Detention and Resulting Medical condition.

Even more significant than the lengthy period of incarceration is the impact the ankle bracelet had on Mr. Barnhart's health. On August 18, 2021, immediately following his arrest and after receiving the GPS ankle monitor, Mr. Barnhart began experiencing extreme pain in his lower right leg.  Almost two months later, on October 5, 2021, he visited his primary care physician due to increasingly unbearable pain. Mr. Barnhart's doctor was unable to find a Doppler pulse in the foot and referred him to emergency care.  After emergency doctors determined that Mr. Barnhart had a blood clot, his ankle monitor was moved to the left leg and he was admitted to McLaren Medical hospital where he remained for ten days and underwent multiple surgeries.[39]

During this ten-day stay, Mr. Barnhart was given a series of tests to determine the cause of the clot (categorized as an arterial clot and diagnosed as "Occluding Arterial Thrombosis") and underwent open thrombectomy surgery on the lower right extremity. Meanwhile, test results came back negative for

---

[39] Due to the voluminous nature of Mr. Barnhart's medical records, counsel has not attached them to the sentencing memorandum in full, but rather will file under seal the portions referenced herein as Exhibit 4. They have been made available to the Probation Office and Counsel sill of course make them available to the Court and government counsel should anyone wish to review them.

Antiphospholipid Syndrome, the only disease that could cause arterial clotting.

Doctors then suspected that the source of the clot might be in the heart after ECHO

cardiograms came back abnormal. Mr. Barnhart then underwent heart surgery

(coronary angiogram and left heart catheterization), but the heart abnormalities

were determined to be non-related to the blood clot in the leg. Mr. Barnhart was

sent home with a prescription for Eliquis (a blood thinner also known as Apixaban)

and instructions to walk for 30 minutes/ 3x a day, for a total of 1.5 hours/day (which

was of course impossible due to the strict conditions of his house arrest).

Five days later, Mr. Barnhart experienced continued worsening pain and

returned to the hospital a second time.  Doctors and surgeons explained to Mr.

Barnhart that due to the recurrent condition (known as "acute limb ischemia"), he

was at high risk for limb loss. Mr. Barnhart recalls that he mentally prepared

himself for the possibility of losing his leg and began the process of researching

prosthetic legs.

Mr. Barnhart then underwent a second surgery – which lasted over 12 hours

- to alleviate the clot.  Prior to the procedure, the surgeon explained the risks and

made it clear to Mr. Barnhart that even after any procedure he would remain at

high risk for amputation and limb loss:

> *"... given the patient's age and severity of symptoms and diffuse occlusive nature of this process and high risk for limb loss, it was recommended to patient that he will be placed on immediate IV anticoagulation and be taken to the OR for aortogram of right lower extremity angiogram, possible thrombectomy, and possible thrombolytic catheter placement. This entire procedure was fully explained to the patient and his mother including this discussion was the possible risks and complications, which include, but not*

*limited to death, bleeding, infection, stroke, DVT, PE, MI, contrast reaction, renal failure, limb loss, need for further procedures, etc. The patient clearly understood that despite all maximal medical, surgical, and interventional procedures, he will still be at high risk for major amputation and limb loss given the diffuse nature of this process…"[40]*

Shortly after his second surgery, Mr. Barnhart moved into his parents' home where he could recover in an environment where he was not completely alone.  He subsequently returned to work even though he still walked with a limp.

The total cost of surgeries and medical treatments amounted to $280,171.00. Fortunately, insurance covered the majority of these costs, but Mr. Barnhart was responsible for $1,756.00 which he paid for out-of-pocket.

Although the cause of the thrombosis/ischemia was never conclusively determined, multiple doctors seen by Mr. Barnhart believed that the ankle monitor may have been responsible. They ruled out all possible causes, with the exception of trauma due to ankle bracelet and/or testosterone supplementation.  Testosterone levels (HCT) were then determined to be normal, thus also ruling out testosterone supplementation, and leaving only the ankle monitor as a reasonable explanation:

> *"Patient's work up for antiphospholipid syndrome was negative. Unlikely that the clot was related to an inherited or acquired hypercoaguable disorder since this was an arterial clot..."[41]*

> *"…it's certainly possible that the trauma caused by this ankle bracelet could have caused the clot and/or testosterone supplementation as this is thrombogenic…"[42]*

---

[40] Page 217 of Barnhart Medical Records [DF261936_500_110315_10]
[41] Page 192 of Barnhart Medical Records [DF261936_500_110315_06]
[42] Page 195 of Barnhart Medical Records [DF261936_500_110315_06]

*"…Last admission he was evaluated by hematology/oncology who stated the only disease that can cause arterial clots in him would be antiphospholipid syndrome, this workup was negative. They stated the trauma from his ankle tether tightness and/or testosterone supplementation could explain the cause of the clot…. I reviewed the resident's note and agree with the documented findings…"[43]*

*"…No prior history of clots in the venous or arterial system. No family history of stroke or clotting. Patient's hct is unremarkable despite being on testosterone supplementation…"[44]*

*"…Hct: 46.3 % -- Normal range between (41.0 and 50.0 )"[45]*

Although Mr. Barnhart also suspected that the ankle bracelet caused the blood clots, he was determined to adhere to the conditions of his release.  Aside from having the bracelet moved to the left leg (which was required for surgery), his only request was to have it loosened.  His left leg has not been negatively affected, and Mr. Barnhart feels that wearing the bracelet on his left leg at the current setting is appropriate and reasonable.

Regrettably, the damage to his right leg cannot be reversed, and Mr. Barnhart continues to live at high risk for recurrence of acute ischemia which is a life threatening medical emergency needing immediate medical attention. Without immediate care upon any recurrence, there is high risk of limb loss or death.[46]  His plan of treatment moving forward requires blood checks every four to six weeks

---

[43] Page 109 of Barnhart Medical Records [DF261936_500_110315_10]
[44] Page 195 of Barnhart Medical Records [DF261936_500_110315_06]
[45] Page 5 of Barnhart Medical Records [DF261936_500_110315_06]
[46] Acute Arterial Occlusion: Causes, Symptoms & Treatment (clevelandclinic.org)

with immediate follow-up care if those tests should come back with abnormalities. In addition, Mr. Barnhart must continue taking Warfarin, a blood thinner notorious for having serious and life-threatening side effects. Warfarin also has a long list of negative interactions with common OTC drugs as well as with many foods. Mr. Barnhart has been told by his doctors to limit his intake of all foods containing Vitamin K (found most commonly in green leafy vegetables but also present in high amounts in more unassuming ingredients such as mustard seed).  Too much vitamin K will cause the Warfarin to be ineffective; just as a drop in vitamin K followed by sudden spike will increase the risk of bleeding.[47]  Of note, Mr. Barnhart had originally been prescribed Eliquis instead of Warfarin (at his request), but Eliquis proved to be ineffective and therefore doctors determined Warfarin to be the only viable option. He will need to be on Warfarin for a minimum of two years, with the realistic possibility of remaining on it for the rest of his life.

It will be extremely difficult, if not impossible, for Mr. Barnhart to maintain the strict diet that is required to safely take Warfarin in federal prison. And although it may be possible to receive blood checks while incarcerated, it's not realistic to think that Mr. Barnhart would have guaranteed access to immediate and quality medical attention in the event of a life threatening emergency.

---

[47] Warfarin side effects: Watch for interactions - Mayo Clinic
Why Vitamin K Can Be Dangerous If You Take Warfarin – Cleveland Clinic

For these reasons, Mr. Barnhart should receive a downward variance in sentencing, which is supported by the PSR at ¶141 stating that Mr. Barnhart's medical condition may warrant a variance from the applicable guideline range.

Following any term of incarceration, Mr. Barnhart will continue to be monitored on supervised release with restitution obligations, which, to be clear, are in and of themselves forms of punishment. *See Mont v. United States*, 139 S. Ct. 1826, 1834 (2019) ("Supervised release is a form of *punishment* that Congress prescribes along with a term of imprisonment as part of the same sentence.") (emphasis added); *United States v. Haymond*, 139 S. Ct. 2369, 2380 n. 5 (2019) ("[T]he sword of Damocles hangs over a defendant every time he wakes up to serve a day of supervised release."); *Gall v. United States*, 128 S. Ct. 586, 595-96 (2007) (noting that even a non-custodial sentence imposes serious restrictions on one's liberty and constitutes punishment, not a "free pass"); *see also United States v. Cohen*, 459 F.3d 490, 496 (4th Cir. 2006) ("[R]estitution is [...] part of the criminal defendant's sentence.").

Mr. Barnhart's time on home detention pretrial, coupled with either a short term of incarceration or with an extended period of supervision with a condition of home incarceration, in addition to the collateral consequences he has and will continue to experience, including the health risks he suffers due to his electronic monitoring, together constitute a sentence that meets the goals of 3553(a).

The collateral consequences that attend to Mr. Barnhart's felony conviction cannot be overstated. District judges have recognized the life-long,

damaging impact of a felony conviction can be relevant to sentencing. *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at pg. 29. Similarly, in imposing a variant probationary sentence, Judge Frederic Block of the Eastern District of New York issued a written opinion on the relevance of collateral consequences to his sentencing determination and urged that judges "consider such consequences in rendering a lawful sentence." *United States v. Nesbeth*, 188 F. Supp.3d 179 (E.D.N.Y. 2016). Judge Block wrote:

> There is a broad range of collateral consequences that serve no useful function other than to further punish criminal defendants after they have completed their court-imposed sentences. Many—under both federal and state law—attach automatically upon a defendant's conviction. The effects of these collateral consequences can be devastating. … Myriad laws, rules, and regulations operate to discriminate against ex-offenders and effectively prevent their reintegration into the mainstream society and economy. These restrictions amount to a form of civil death and send the unequivocal message that "they" are no longer part of "us."

188 F. Supp. at 3d at 179 (*internal quotations, alterations, and citations omitted*). In *Nesbeth*, the defendant was also a first offender, convicted of importation of drugs. Though that defendant's guideline range was 33-41 months, Judge Block "rendered a nonincarceratory sentence. . . in part because of the number of statutory and regulatory collateral consequences in balancing the 18 U.S.C. § 3335(a) factors." *Id.* at 180. *See also United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) (despite guidelines of 78-97 months, district judge imposed sentence of twenty months in part because conviction "made it doubtful that the defendant could pursue his career as an academic or translator, and therefore that the need for

further deterrence and protection of the public is lessened because the conviction itself already visits a substantial punishment on the defendant"); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (loss of the defendant's "teaching certificate and his state pension as a result of his conduct" is appropriate sentencing consideration consistent with requirement that "the sentence reflect the need for just punishment and adequate deterrence").

The collateral consequences that Mr. Barnhart has already experienced and will continue to experience are severe and should be considered by this Court in assessing what would constitute a "just punishment" and "adequate deterrence."

With respect to deterrence, it is often presumed that incarceration is necessary to achieve deterrence, and that the more incarceration imposed, the greater the deterrent effect. However, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[48] In short, there is little empirical support for the prospect that a period of

---

[48] Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28 (2006) ("Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."); *see also* National Institute of Justice, *Five Things About Deterrence*, at 1 (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf (stating, among other things, that "[i]ncreasing the severity of punishment does little to deter crime," and "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment"); Ellen Raaijmakers *et al.*, *Exploring the Relationship Between Subjectively Experienced Severity of Imprisonment and Recidivism: A Neglected Element in Testing Deterrence Theory*, 54 J. OF RSCH. IN CRIME AND DELINQ. 1, 4 (2017) ("[T]he available evidence points toward a null or a slightly criminogenic effect of imprisonment but has rarely found support for a clear specific deterrent effect."); Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 CRIME & JUST.

confinement will be any more effective at deterring Mr. Barnhart or others from committing this offense. And, indeed, the most effective deterrent is the certainty of punishment, not the severity of punishment. *See, e.g.*, *United States v. Bannister*, 786 F. Supp. 2d 617, 668 (E.D.N.Y. 2011) ("[G]iven that effective deterrence arises from certainty, not harshness, of punishment, our society might better consider whether our scarce resources would be better spent, not on extended incarceration, but on eliminating social conditions encouraging crime and on non-incarceratory techniques").

D. **A sentence below what the government is seeking would avoid unwarranted disparities.**

With respect to promoting respect for the law, a sentence below what the government has requested will promote respect for the law. Similarly situated January 6 cases have received considerably less in most, but not all, cases. A sampling of the most serious cases with similar conduct follows:

- *United States v. Sargent*, 21-cr-258 (TFH): Sargent pleaded guilty to assault on a police officer (111a) and civil disorder (231), among other charges, and was sentenced to 14 months incarceration when the government requested 27 months. In addition to twice swinging at an

---

199, 201 (2013) ("[T]here is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation.  Instead, the evidence suggests that reoffending is either unaffected or increased."); Zvi D. Gabbay*, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity").

officer, he recorded the scene on social media while boasting, "we got a clash of police going. . . Shit's getting fucking rowdy out here now. We got flash bangs."[49] After striking one officer, Sargent tried to strike another officer, but instead made contact with another protestor.  At one point, that defendant bragged that he "duffed an officer in the face." He also told officers "fuck you guys, you guys are either with them or with us and repeatedly berated officers." After the riot, he repeatedly gleefully bragged about punching an officer. After his arrest, he lied to the FBI about his actions.[50]

- *United States v. Leffingwell,* 21-cr-5 (ABJ): Leffingwell, a 57 year old veteran who entered the Capitol at the Senate wing doors and chanted at officers standing before him to "join us" and then, when two officers tried to repel him and the crowd around him, struck both officers in the head, landing three blows, pleaded guilty to assault (111a) and was sentenced to 6 months when the government sought 27 months.[51]

- *United States v. David Blair*, 21-cr-186 (PLF): Blair, who carried a large confederate flag and a backpack containing a knife and duct tape, and pushed a large lacrosse stick against a police officer's chest while yelling that he would not submit to commands, pleaded guilty to civil disorder (231) and was sentenced to five months.[52]

---

[49] *United States v. Troy Sargent*, 1:21CR258(TFH), Gov. Sentencing Memo, ECF. No. 70.
[50] *Id.*
[51] *United States v. Leffingwell,* 1:21CR5 (ABJ), ECF. No. 4.
[52] *United States v. David Blair*, 1:21CR186 (PLF), ECF. No. 55.

- *United States v. Robert Palmer,* 21-cr-328 (TSC): Palmer pleaded guilty to assault (111b) and was sentenced to 63 months after repeatedly assaulting police officers throwing a wooden plank like a spear, spraying officers with a fire extinguisher which he later threw at them, and then attacked again, with a piece of scaffolding and a second fire extinguisher as well as a traffic cone.  (His sentencing range was 63 to 78 months rather than 46 to 57 months because he lost his credit for acceptance of responsibility after posting false narratives about January 6 on his fundraising website.)[53]

- *United States v. Devlyn Thompson*, 21-cr-461 (RCL): Thompson pleaded guilty to assault (111b) after exhorting officers to fight one on one, passing out riot shields to rioters encouraging them to use the shields as weapons against the officers, throwing a large box speaker at the police line, assaulting a police officer with a metal police baton, and remaining in the tunnel for more than 13 minutes. He was "among the first of the rioters to arrive on the inaugural stage and he was one of the last to leave. For these numerous assaults over an extended period, he was sentenced to 46 months when the government requested 48 months.[54]

- *United States v. Nicholas Languerand*, 21-cr-353 (JDB): Languerand, an individual who had prior assaultive and threatening conduct,

---

[53] ECF 30, Government Sentencing Memorandum.
[54] ECF 30, Government Sentencing Memorandum.

68

pleaded guilty to assault (111b) after watching the violence for two hours before assaulting officers by throwing a piece of wood, a heavy black speaker, multiple sticks, and a large traffic cone, using a riot shield against the officers, and later bragging about and offering justifications for his violent acts, and was sentenced to 44 months when the government requested 51 months. Languerand also had an extensive arsenal when he was arrested, as well as writings deeply critical and menacing of the FBI and photos of the proud boys, three percenters, nazi iconography, etc. He posted that he had carried a firearm with him to the Capitol although there was no evidence that this was true.[55]

- *United States v. Scott Fairlamb,* 21-cr-120 (RCL); Fairlamb pleaded guilty to assault (111b) and obstruction after entering the Senate Wing one minute after it was breached, screaming at the officers, armed with a police baton which he brandished. He shoved an officer and punched him in the face.  He shoved the officer so hard that he fell into a line of rioters, after which he stuck his finger in the officer's face and punched him in the face shield.[56] After January 6, he both lied about and bragged about his activities. He was sentenced to 41 months when the government requested 44 months.

---

[55] ECF 34, Government Sentencing Memo.
[56] ECF 50, Government Sentencing Memo.

- *United States v. Thomas Webster,* 21-208 (APM): Webster, a former marine and police officer, was found guilty of five felony counts including assault (111b) and civil disorder (231) among other charges after a trial and was sentenced to 120 months when the government sought 210 months. Webster brought a bulletproof vest and weapon with him to the District of Columbia and wore that vest and carried a metal flagpole at the Capitol. He shouted obscenities at the officers, "you fucking piece of shit. You fucking commie motherfuckers, man. You wanna attack Americans? No, fuck that" and tried to provoke a fight. He then wielded his flagpole as a weapon, swinging it with enough force to break it in half. He then charged directly at one of the officers tackled him to the ground, and dragged him by his helmet, pinning him to the ground and attempting to rip off his gas mask. He restrained him on the ground while others kicked him. He subsequently bragged about his misconduct and obstructed justice by deleting photographs he had taken. During his trial, rather than express remorse, he villainized the officers he had attacked.[57]

- *United States v. Duke Wilson,* 21-cr-345 (RCL): Wilson pleaded guilty to obstruction (1512) and assault (111a) and was sentenced to 51 months. He physically engaged in hand to hand combat with officers at the Lower West Terrace, punching, shoving and kicking them as well

---

[57] ECF 104, Government Sentencing Memo.

as trying to steal their riot shields. He then picked up a several feet long PCV pipe and struck at the officers, striking at least two different officers, and threw it into the crowd of officers. Despite these actions, the government allowed Wilson to plead guilty to 111(a) which did not include holding him responsible for the assault with the PVC pipe as a dangerous weapon.[58]

- *United States v. Kevin Douglas Creek,* 21-cr-645 (DLF): Creek, a former Marine who brought mace and a knife to the Capitol, pleaded guilty to assault (111a) after he pushed through the barricade and grabbed Officer JCM driving him back forcefully several feet, striking him in the face shield before letting him go (arguably a physical restraint) and shoved Officer RSE to the ground and kicked him. He also picked up a ratchet strap – a thick strap with heavy metal buckles and threw it at the officers.[59] He was sentenced to 27 months, the government's request.

- *United States v. Matthew Miller*, 21-cr-75 (RDM): Miller pleaded guilty to assault (111a) and obstruction (1512) after he threw beer cans and batteries at officers, and unleashed the contents of a fire extinguisher on more than a dozen officers as other rioters were assaulting them

---

[58] ECF, Government Sentencing Memorandum
[59] ECF 48, Government Sentencing Memorandum

(the same fire extinguisher later thrown at officers by Palmer). He was sentenced to 33 months.[60]

- *United States v. Greg Rubenacker,* 21-cr-193 (BAH): Rubenacker pleaded guilty without a plea agreement to all ten counts, including obstruction (1512), civil disorder (213) and assault (111a) among other charges, and was sentenced to 41 months. According to the government, he was one of the first people to enter the Capitol, entered a second time after leaving, chased Officer Goodman through the Capitol, berating him and other officers, swung a water bottle at one officer's head and threw liquid on another officer.[61]

- *United States v. Alan Byerly* 21-cr-257 (RDM): Byerly was charged with assault (111b) for assaulting several officers with a Taser, but pleaded guilty to assault (111a) and striking another person (113) for assaulting a reporter. According to the government, Byerly engaged in three separate assaults-- he activated a stun gun on one police officer and when it was taken by officers, he physically struck them and pushed against them, grabbing an officer's baton, he assaulted a group of officers using an enormous all metal Trump billboard with sharp edges that was capable of splitting someone's head open as a battering ram (hard to imagine this was less of a dangerous weapon than the flagpole Mr. Barnhart swung), and viciously assaulted a member of the

---

[60] ECF 67, Government Sentencing Memorandum
[61] ECF 56, Government Sentencing Memorandum

press, dragging him up and down the staircase. As the government described it, "Byerly grabbed the victim with both hands near the victim's shoulder and upper chest and pushed him backward. Byerly then pushed and dragged the victim past the site of the original altercation and towards a dense crowd. Byerly eventually placed both of his hands in the area of the victim's face and neck and continued to shove and push the victim away from the stairs, and toward a low stone wall that separated the stairs of the West Front of the Capitol Building from the west lawn below." This was arguably a restraint of the victim, but that enhancement was not sought. Nor was a weapon enhancement under 111b applied. The government requested a sentence of 46 months and he was sentenced to 34 months.[62]

- *United States v. Cody Mattice and James Mault,* 21-cr-657 (BAH): Mattice and Mault pleaded guilty to assault (111a) after planning and preparing for violence before coming to D.C., bring chemical spray and batons with them, pulling down a section of the bike rack fencing and leading the attack on the west plaza and later body-surfing over other rioters to enter the Lower West Terrace tunnel; both also used a chemical spray against the officers. Both Mault and Mattice lied about their actions that day with Mattice claiming that he was using the chemical spray against protesters in support of the police. Both

---

[62] ECF 46, Government Sentencing Memorandum.

avoided the 111(b) charge by being given the opportunity to plead to 111(a) despite their actions; each was sentenced to 44 months.[63]

- *United States v. Howard Richardson*, 21-cr-721 (CKK): Richardson bludgeoned a police officer three times with a long metal pole he brought to the Capitol, only stopping when it broke; less than 2 minutes later, he helped use an enormous metal Trump sign as a battering ram against police officers. He was sentenced to 46 months. There were however aggravating factors – he was on bail for illegal possession of a firearm on January 6; he made false representations to the Court during his plea hearing; and after his plea but before sentencing he was arrested again for aggravated assault and lied to the local police about his conduct.[64]

- *United States v. Ricky Wilden,* 21-cr-423 (RC); Wilden, a member of the Proud Boys, assaulted numerous police officers with a chemical irritant while he wore goggles that he had brought with him and then threw the canister at the officers; he entered the Capitol. After January 6 he deleted Facebook messages and videos.[65]  He pleaded guilty to assault (111a) and the government sought 30 months. At the time of his sentencing, he had a pending charge for felony assault of his spouse with a deadly weapon and was using illegal

---

[63] ECF 60 and 61, Government Sentencing Memoranda.
[64] ECF 35, Government Sentencing Memo.
[65] ECF 36, Government Sentencing Memo.

substances while on release. Despite assaulting with a chemical irritant and the empty canister, he was not required to plead to the more serious assault charge and did not receive the dangerous weapon enhancement. He was sentenced to 24 months.

- *United States v. Marshall Neefe,* 21-cr-567-1 (RCL): Neefe pleaded guilty to obstruction (1512) and assault (111a) after he made plans to obstruct congress and then helped use the enormous (8 feet tall and 10 feet wide) metal Trump sign as a battering ram against police officers, then entered the Capitol building, pleaded guilty to assault (111a) and obstruction (1512). According to the government, prior to January 6, Neefe had shared his intention to bring weapons and commit violence. He admitted to making a wooden club with an American flag stapled to it to use as a potential weapon. Government requested sentence of 46 months (didn't include the weapon enhancement under 111b) and Neefe was sentenced to 41 months.[66] After the attacks, he celebrated his involvement.

- *United States v. Mark Mazza,* 21-736 (JEB): Mazza, a veteran, pleaded guilty to assault (111b) and CPWL after he brought two loaded handguns with him to the Capitol. While armed with one of his guns (he apparently lost the other in the crowd and it was subsequently recovered from another rioter who assaulted an officer), he pushed

---

[66] ECF 84, Government Sentencing Memo

against the officers in the tunnel, berated and assaulted officers with a stolen police baton and remained armed on the Capitol grounds for several hours. "With his left hand, Mazza struck with full force against MPD Officer P.N.'s ungloved hand." He then showed off his stolen baton and engaged in the "heave-ho" pressure while brandishing the baton against police in the tunnel. After he left, he engaged in numerous acts of obstruction including filing a false police report about how he lost his gun, filing off the serial number of the stolen police baton, and providing false information to the capitol police.[67] The government sought a sentence of 78 months citing the egregiousness of his acts, and he was sentenced to 60 months.

- *United States v. Mark Ponder,* 21-cr-259 (TSC): Ponder pleaded guilty to assault (111b) and was sentenced to 60 months. According to the government, Ponder charged at an officer with a long thin pole, swinging it aggressively at him such that it broke. Moments later he returned with a thicker, sturdier pole and again repeatedly struck another officer. Again, approximately 10 minutes later, he swung that same pole like a baseball bake at Officer JC, striking him in the left shoulder. He was then arrested, but released with instructions to leave when no transport was available. Instead, he returned to the lower west terrace where he used a police shield against the officers. He

---

[67] ECF 30, Government Sentencing Memo.

76

remained on capitol grounds until at least 5 pm. According to the government, Ponder had an extensive criminal history, including crimes of violence, resulting in a sentencing guideline range of 57 to 71 months.[68]

- *United States v. Charles Bradford Smith,* 21-cr-567-2 (RCL): Smith pleaded guilty to obstruction (1512) and assault (111a). According to the government, he conspired with codefendant Neefe for two months to obstruct the certification of the election, planned and prepared for violence, and once there, assisted in hoisting the large metal Trump sign (described above) and used it as a battering ram assaulting at least  three police officers; sentenced to 41 months when government sought 44 month sentence.[69]

- *United States v Sandlin,* 21-cr-88 (DLF) Sandlin pleaded guilty to assault (111a) and obstruction (1512k) and was sentenced to 63 months. According to the government, Sandlin with his coconspirators DeGrave and Colt, substantially planned for their participation, bringing a car full of weapons, including knives, bear spray and a pistol fully anticipating violence; Sandlin then directly assaulted at least 2 capitol police officers – attempting to rip off one officers helmet and taking a swing at another officer's head and assisted in the assault of at least 4 others, then, in the aftermath both celebrated his

---

[68] ECF 54, Government Sentencing Memorandum
[69] ECF 90, Government Sentencing Memorandum

participation and tried to profit off of it and obstructed the investigation.[70]

- *United States v. Hernandez,* 22-cr-42 (CRC): Hernandez pleaded guilty to assault (111a) and civil disorder (231) after he climbed through the window at the Senate Wing Door, entered the speaker's conference room and senate gallery, he hit a door in the hallway with his flagpole, and attempted to enter where congressional staff were barricaded in an office, he then assaulted a police officer with his flagpole by hitting him in the head.[71] The dangerous weapon enhancement was not applied and he was sentenced to 24 months.

- *United States v. Douglas Jensen,* 21-06 (TJK) was found guilty after trial before a jury of assault (111a), civil disorder (231) obstruction (1512) and other assorted misdemeanors and was sentenced to 60 months, after he entered the Capitol in the first wave and led a group of rioters menacingly chasing Officer Goodman towards the Senate Chamber, breached the Capitol a second time after exiting, and repeatedly riled up the crowd and threatened officers, while carrying a knife in his pocket. As officers tried to escort him out, he pushed and shoved them in a very agitated state.

- *United States v. Philip Young,* 21-617 (DLF) Young pleaded guilty to all charges, including assault (111a) and civil disorder (231) without a

---

[70] ECF 92, Government Sentencing Memorandum.
[71] ECF 32, Government Sentencing Memorandum.

plea agreement. The government requested a sentence of 40 months and he was sentenced to 8 months. Early on in the breach, Young rushed up the stairs, grabbed and lifted a barricade and pushed it into two MPD officers; after being forced back down the stairs, he pushed the barricade forward against the officers a second time. The government sought a dangerous weapon enhancement for the bike rack, but it appears the Court did not agree.[72]

- *United States v. David Judd,* 21-cr-40 (TNM): Judd was found guilty after a stipulated trial of obstruction (1512) and assault (111a). According to the government, Judd was fully aware of the certification process, intended to disrupt the activities of Congress before coming to D.C., and "acted as an on-the-ground commander of other rioters, directing, encouraging, and instigating the violence, chaos, and destruction in and around the tunnel . . . yelling commands to organize rioters, passing items into the tunnel to be used as weapons" etc. He then joined in coordinated pushes against the police line and lit a firecracker and threw it at the police line.[73] The government characterized his conduct as "some of the most aggravating conduct that we've seen on January 6th."[74] The firecracker was found to be a

---

[72] Counsel does not have access to the transcript and is making this assumption based upon the sentence ultimately imposed.

[73] ECF 527, Government Sentencing Memorandum.

[74] Transcript at p. 17. See also, Transcript at 26 (seeking a terrorism enhancement, the government represented 'the degree of his conduct was so great, and his intent was there so great, coupled with all of his other actions in the tunnel, which include directing the rioters, passing the shields in, passing the crutch in, telling people were to go, engaging in the heave-ho himself, this

dangerous weapon, and the Court found that Judd intended to cause bodily injury by throwing the firecracker, but the Court disagreed with the guideline range of 78 to 97 months proposed by the government and probation and found a range of 37 to 46 months and then varied downward to impose a sentence of 32 months, finding the "advisory guideline produces an advisory sentence that is overly harsh." [75] The government requested a sentence of 90 months and he was sentenced to 32 months.

- *United States v. Lucas Denney,* 22-cr-70 (RDM) Denney pleaded guilty to assault (111b) without a plea agreement after deploying pepper spray at officers and assaulting them with a pole, brandishing a baton, and pushing a riot shield into officers an swinging at an officer who had become separated from the police line. He wore full battle attire and repeatedly confronted police officers, beginning at the West Plaza at the metal bike racks making multiple attempts to pull the barricades from the officers and kicking it into officers. Then, he sprayed pepper spray at the officers on multiple occasions and then threw his canister at the officers; he subsequently swung a long pole at another officer, launched a large tube toward other officers. He later joined the rioters at the Lower West Terrace carrying a baton or stick

---

Defendant did it all, and he did it over the course of a long period of time."); Transcript at 53 ("looking at all of the January 6 rioters, I think this Defendant is at the high end of them also.)

[75] Transcript of Sentencing. The Court found the guideline range to be lower because of its reading of the 1512 guidelines.

in his hands. Then, he swung his fist at Officer MK, grabbed him in an attempt to pull him down the stairs. After the attack, he lied to the FBI agents about his involvement and deleted information from a social media account. Denney was associated with the Proud Boys and Three Percenters and before January 6 recruited people to his militia group and to participate in the events of January 6 which he expected to be violent. He specifically sought out people who would be willing to engage in violence to join him and solicited donations to pay for protective gear and pepper spray. According to the government, he sought out battles at BLM Plaza the night before the rally.[76] The government sought a sentence at the middle of the guideline range of 87 to 108 months (presumably 97 to 98 months) and he was sentenced to 52 months.[77]

- *United States v. Head and Young*, 21-291(ABJ) *Discussed supra.*

- *United States v. Guy Reffitt*, 21-cr-32 (DLF): Reffitt was found guilty after a trial. According to the government, he was a member of a militia group; engaged in extensive planning, came to DC **with weapons** and a bullet proof vest, police-style flexicuffs which he **brought onto the Capitol grounds**, prepared to fight. He espoused overthrowing the government on social media, made statements evidencing his intent to commit violence and his lack of remorse. He

---

[76] ECF 46, Government Sentencing Memorandum
[77] ECF 63, Government Supplemental Sentencing Memorandum

also possessed a firearm silencer after his arrest and committed an assault on his wife with a firearm prior to January 6.[78] His guideline range after trial was 108 to 135 months; the government argued the guidelines should be 135 to 168 months and sought an upward departure to a sentence of 180 months. The Court found the guidelines to be 87 to 108 months and imposed a sentence of 87 months.[79]

One must also compare the behavior of the codefendants in this case and compare their specific actions and relative culpability. Again, it is important to note that these individuals are codefendants because they acted in the same area at the same time, not because they planned to do so or conspired to do so or even knew each other. Mr. Jersey is the only codefendant to be sentenced to date and his conduct was considerably more egregious, he did not have nearly 2 years of uncredited home confinement and he did not suffer the health consequences of that confinement. He caused serious bodily injury by his actions, unlike Mr. Barnhart, and yet his guideline range would be the same if the Court applied the restraint of victim enhancement sought by the government. The government sought a sentence of 63 months in that case and the Court imposed a sentence of 51 months. As noted, that case was more egregious because of the serious bodily injury suffered by the officer, resulting in more than $32,000 in damages. According to the government, Mr. Jersey took souvenirs home with him – two MPD helmets and an MPD badge.

---

[78] ECF 158, Government Sentencing Memorandum
[79] ECF 175, Transcript of Sentencing hearing.

His Facebook postings suggested he anticipated violence would occur and that he would have a weapon with him. He wielded a large, gnarled stick. He "grabbed Officer A.W.'s baton with one hand and reached towards Officer A.W.'s face with this other hand" grappling over the baton for several seconds and knocked Officer A.W. to the ground. He then grabbed another baton and struck at other officers. The other codefendants (Whitton who struck officers with a crutch, Stager who beat Officer BM with a flagpole, and Courson who struck officer BM with a baton, McAbee who pulled AW out of the archway and down the stairs after engaging with Mullins in a tug of war with officers who were trying to pull Officer AW back to safety) have not yet been sentenced.

## Conclusion

Logan Barnhart admitted to, and feels ashamed for, the crimes that he committed. He has already been punished by nearly two years of home detention, not to mention the medical condition created by the location monitoring administered as part of that home detention. Thus, a sentence well below the guidelines is warranted and would result in a sentence that is sufficient, but not greater than necessary, to meet all of the purposes of sentencing. Mr. Barnhart agreed in the plea to pay restitution of $2000 which is what the government is seeking in this case and a special assessment of $100, and he stands by that commitment.

Respectfully Submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____ _____/s/_____
Michelle Peterson
Chief Asst Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500