**United States District Court**
**For The District of Columbia**

| | |
|---|---|
| **United States of America,** | |
| v. | Case No. 21-cr-35-6 (RC) |
| **Logan James Barnhart,** | |
| Defendant. | |

**Motion for a Reduction in Sentence**

**I.        Introduction**

Logan Barnhart, through undersigned counsel, respectfully moves this Court for a reduction in sentence under 18 U.S.C. § 3582(c)(1)(A) and U.S.S.G. § 1B1.13(b)(1)(B), (b)(1)(C) and (b)(5).  After alerting the BOP to what Mr. Barnhart knew to be another blood clot in August 2023—he had twice suffered from them in 2021 and knew exactly what they felt like—it took until December 2023 for surgery to be performed, after which he developed a serious complication called compartment syndrome.  Compartment syndrome is intensely painful swelling that causes destruction of the muscle tissue because of the high pressures that develop, and it was a direct consequence of the BOP's delay in providing treatment for the blood clot. Mr. Barnhart is in the BOP's control; he cannot call an ambulance when he wants to, see a specialist when he needs to, or fill a prescription when a specialist orders it.  He relies on the BOP to do all of this and more.  Yet despite his placement in a federal medical center, they are not fulfilling their duty of care, and he is at risk of losing life and limb.  Mr. Barnhart deserves better treatment than he is receiving.

1

Here is a brief overview of how long it took the BOP to address the blood clot, the missteps along the way, and the dire consequences that ensued:

- **June 6, 2023:**  Mr. Barnhart arrives in BOP custody; although the BOP had in its possession 160 pages of his prior medical records, he is not provided the required statin or antiplatelet medications and his dose of blood thinner is lower than the recommended treatment dose for those with prior blood clots.

- **August 14, 2023:**  He complains of right leg pain similar to that in 2021.  He is referred to a physical therapist, who correctly notes this is not a PT issue.  He is taken off the required statin he was only finally given in July 2023.

- **August 17 & 30, 2023:**  He is seen by a nurse twice complaining of the exact same pain, identifying it as exactly what he experienced in 2021, with no treatment.

- **September 12, 2023:**  Even though the physical therapist made clear that this is not a musculoskeletal issue, Mr. Barnhart is referred to the University of Kansas Physical Medicine and Rehabilitation Clinic.  As with the physical therapist, this doctor also concludes that this is not a musculoskeletal issue, but rather "consistent with vascular claudication."

- **September 25, 2023:**  A month and ten days after his symptoms began, he is finally seen by a vascular surgeon, but it is by a telemedicine appointment.  The vascular surgeon states that Mr. Barnhart should be given an antiplatelet medication and a statin (drugs which he should have already been on) and that he should be seen in person by the vascular specialists in 2-3 weeks.

- **October 26, 2023:**  Despite the vascular surgeon's recommendation, neither the antiplatelet medication nor the statin are started until a cardiologist recommends the same after a telemedicine appointment in October.

- **November 1, 2023:**  Despite the vascular surgeon's recommendation, he is finally seen in person by vascular surgery 5 weeks after his telemedicine appointment.

- **December 13-16, 2023:**  He finally has surgery (called catheter directed thrombolysis) in the hospital to break up the clots.  Following the surgery, he suffers from compartment syndrome.  To relieve the pain, an incision is made on each side of his right leg, and left open to allow the swelling to go down.  The incisions are each between 8 and 9 inches long.

- **December 22, 2023:**  He returns to the prison with instructions to take oxycodone as needed for pain.  The dose the prison provides him is a third of that recommended by the

hospital. On December 25, he reports so much pain that he must have one of the wound vacs removed, which are required for optimal healing of the gaping wounds on his right leg.

*See generally* Ex. 2, Medical Records (filed under seal); *see also* Ex. 1, Declaration of Drs. Mushero & Solfisburg (hereinafter, "Drs. Mushero & Solfisburg Decl."). In addition, (1) Mr. Barnhart has failed to receive the required follow-up care for his prior heart attack; (2) his high cholesterol—which puts him at risk of another heart attack or stroke—has been improperly managed; and (3) he has three painful and infected teeth that have yet to be removed.

Mr. Barnhart's conditions are extraordinary and compelling. He is both "suffering from a serious physical or medical condition" that "substantially diminishes [his] ability [] to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover" and "suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which [he] is at risk of serious deterioration in health or death." U.S.S.G. § 1B1.13(b)(1)(B)(i) & (C); *see also id.* at § 1B1.13(b)(5) ("Other Reasons.—The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4)."). Two doctors who reviewed Mr. Barnhart's medical records concluded that "Mr. Barnhart has several serious medical conditions that the BOP has not properly managed according to widely-accepted standards of care." *See* Drs. Mushero & Solfisburg Decl. at ¶15. He asks this Court to order his immediate release, with a period of home detention to follow.

## II.     Background

In August 2021, Mr. Barnhart was charged for his participation in the activities at the U.S. Capitol on January 6, 2021.  *See* Superseding Indictment, ECF No. 92 (Aug. 4, 2021).  On August 18, 2021, while on pretrial release, he began experiencing extreme pain in his lower right leg.  *See* Barnhart Mem. in Aid of Sent'g at 58, ECF No. 294 (Mar. 13, 2023).  Two months later, he was referred to the emergency room for a blood clot, which was suspected to have been caused by his ankle monitor.  *Id.* at 58, 60.  He spent ten days hospitalized, during which he underwent open thrombectomy surgery and heart surgery.  *Id.* at 58.  Five days after he was sent home from the hospital he experienced worsening pain and went back to the hospital.  *Id.* at 59.  He was informed that because of his condition, called acute limb ischemia, he was at high risk for limb loss and the condition could not be reversed.  *Id.*  He then had a second surgery lasting over 12 hours to alleviate the clot.  *Id.*  Even after this surgery, he remained at high risk for amputation and limb loss.  *Id.*  He required blood checks every four to six weeks, with immediate follow-up care if the tests were abnormal.  *Id.* at 61.  He was prescribed Warfarin, a blood thinner with serious side effects and negative interactions with common drugs and food, but which he was required to be on for a minimum of two years, because Eliquis, another similar medication, had been ineffective.  *Id.* at 62.

In September 2022, Mr. Barnhart pleaded guilty to one count of assaulting, resisting, or impeding certain officers using a dangerous weapon in violation of 18 U.S.C. § 111(a)(1) and (b) (Count 10).  ECF No. 234 (Sep. 28, 2022); Min. Entry (9/28/2022).  In April 2023, this Court sentenced him to 36 months of incarceration and 36 months of supervised release.  *See* Judgment, ECF No. 309 (May 1, 2023).  Mr. Barnhart entered prison on June 6, 2023.  *See* Ex. 5, BOP

Records at 2 (Sentence Computation).  His current projected release date is December 24, 2025, with a home detention eligibility date of September 7, 2025.  *Id.*

### III.  Legal Principles

This Court has the authority to order Mr. Barnhart's early release under 18 U.S.C. § 3582(c)(1)(A)(i) and U.S.S.G. § 1B1.13 (Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A) (Policy Statement)).  Under the First Step Act of 2018, imprisoned defendants may bring their own motions for compassionate release in the district court. 18 U.S.C. § 3582(c)(1)(A) (2018).

Such motions have a three-step framework.  *First*, a defendant petitioning for a reduction in sentence must exhaust administrative remedies.  *Id.*  *Second*, a court must consider whether "extraordinary and compelling reasons warrant" the requested reduction.  *Id.*  *Third*, the court must consider the sentencing factors enumerated in 18 U.S.C. § 3553(a).  *Id.*

Because § 3582(c)(1)(A) requires a reduction to be "consistent with applicable policy statements issued by the Sentencing Commission," new sentencing guidelines that went into effect on November 1, 2023, describing what qualifies as "extraordinary and compelling," apply. *See* U.S.S.G. § 1B1.13, p.s. (last amended Nov. 1, 2023).  With these amendments, the guidelines now contain six types of circumstances that may qualify as "extraordinary and compelling."  *Id.* § 1B1.13(b).  These are: (1) the medical circumstances of the defendant, (2) the age of the defendant, (3) the family circumstances of the defendant, (4) whether the defendant was a victim of abuse while in custody, (5) other reasons that are similar in gravity to 1-4, and (6) an unusually long sentence.  U.S.S.G. § 1B1.13, p.s.  Mr. Barnhart satisfies the medical circumstances and therefore is eligible for a reduction in sentence.

### IV.   Argument

#### A. Mr. Barnhart has exhausted his administrative remedies.

Mr. Barnhart first filed his own reduction in sentence request with his institution on or around November 5, 2023, which counsel supplemented on December 1, 2023, detailing his medical concerns. *See* Ex. 3, Exhaustion Letter. The BOP responded on December 6, 2023, denying the request based on "extraordinary and compelling circumstances: medical condition" because "[i]t appears your client does not satisfy the medical components as specified in the program statement." *See* Ex. 4, BOP Response. Thus, 30 days have lapsed "from the receipt of such request by the warden of the defendant's facility," making his motion properly before this Court. *See* § 3582(c)(1)(A)(i).

#### B. Mr. Barnhart's Health Conditions and Their Mismanagement by the BOP Are Extraordinary and Compelling Reasons for A Reduction in Sentence.

Mr. Barnhart has "several serious medical conditions that the BOP has not properly managed according to widely-accepted standards of care," and he "requires regular appointments with specialists [to] help ensure he receives the standard of care to preserve his mobility and prevent further clots, heart attacks, or other complications from his medical conditions." *See* Mushero & Solfisburg Decl. at ¶¶15-16. As these doctors make clear throughout their declaration, Mr. Barnhart is "suffering from a serious physical or medical condition" that "substantially diminishes [his] ability [] to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover" and "from a medical condition that requires long-term or specialized medical care that is not being provided and without which [he] is at risk of serious deterioration in health or death." U.S.S.G. § 1B1.13(b)(1)(B)(i) & (C); *see also* § 1B1.13(b)(5).

### *i.    Recurrent arterial blood clots and post-surgical pain*

As this Court is aware, while on house arrest in October 2021, Mr. Barnhart developed right leg pain and was diagnosed with a large blood clot in the arteries of his right leg. *See* Drs. Mushero & Solfisburg Decl. at ¶5; *see also* Barnhart Mem. in Aid of Sent'g at 58-59. He was hospitalized and underwent surgery to dislodge the clot, after which he was discharged with blood thinning medication (apixaban). Drs. Mushero & Solfisburg Decl. at ¶5. However, he returned 10 days later with similar right leg pain, which was found to be repeat clotting in his leg arteries requiring a second surgery. *Id.* As his attorney made clear at sentencing, the damage to his right leg was irreversible, and he continued to be at high risk for a recurrence of blood clotting in his limbs (also called acute ischemia). Barnhart Mem. in Aid of Sent'g at 61. "Without immediate care upon any recurrence, there is a high risk of limb loss or death." *Id.*

When Mr. Barnhart left the hospital a second time and before he arrived in prison, he was on several medications essential to preventing future blood clots, including warfarin (a different blood thinner that was later switched back to axipan sometime before June 2023), a statin (which is both cholesterol lowering and clot stabilizing), and an antiplatelet medication (Clopidogrel). Drs. Mushero & Solfisburg Decl. at ¶6. "Clopidogrel had been started in October 2021 after Mr. Barnhart was found to have had a heart attack and is recommended for people who develop clots or have poor blood flow in their extremities." *Id.* Yet "[d]uring this transition to prison, several important medications were not continued" including the statin and Clopidogrel, while his blood thinner was "at a dose lower than recommended for treatment of previous blood clots." *Id.* This is notwithstanding the fact that the Bureau of Prisons had within its possession Mr. Barnhart's 160 pages of medical records from his 2021 inpatient hospitalization and outpatient doctor's

visits in. *See generally* Medical Records at 416-576. Doctors Mushero and Solfisburg underscore that "[t]hese medications should not have been stopped for Mr. Barnhart, as they were essential in preventing further heart attacks, strokes, and worsening of his peripheral artery disease in the aftermath of his arterial blood clot." Drs. Mushero & Solfisburg Decl. at ¶6.

On August 14, 2023, Mr. Barnhart complained of aching right left pain that worsened when he walked. *Id.* at ¶7. He reported that they were very similar to the pain he felt during his arterial blood clots in 2021. *Id.* "While the concern for another arterial clot was noted in his sick visit August 14, he was first referred to physical therapy and taken off of his statin, ***neither of which are indicated for diagnosis or treatment of blood clots.***" *Id.* (emphasis added). In fact, the whole reason to be on a statin was to help with his clots, and yet he only received a month of statins in the BOP's care: "Statins work to stabilize any existing clot to reduce the risk of it growing and reduce the risk of forming new clots. This reason was listed for starting a statin in July, but he only received about a month of this necessary treatment before it was stopped with no documented plan for restarting." *Id.*

"After he was seen by physical therapy, who correctly determined this was not a physical therapy problem, he was seen again on August 17th and 30th by an APRN [advanced practice registered nurse] for the same problem[.]" *Id.* at ¶8.; *see also* Medical Records at 28 of 277 (PT statement that his "signs and symptoms do not appear to be musculoskeletal in nature as his symptoms were not reproduced during today's examination"); 20 & 23 (of 277) (twice describing complaint, history of extremity arterial occlusion in 2021, and his statement that "It feels like it did in the past"). Yet, nothing happened to actually address his pain or complaints that this felt like a blood clot. And even though the BOP physical therapist made clear that this was not a

8

physical therapy problem, Mr. Barnhart was referred to the University of Kansas Physical Medicine and Rehabilitation Clinic, where he was seen on September 12, 2023. *See* Medical Records at 396. Just as with the physical therapist, this doctor also concluded that this was not a musculoskeletal issue, but rather "[t]his is consistent with vascular claudication," *i.e.*, pain from reduced blood flow to the limbs associated with peripheral artery disease. *Id.* at 399.

Finally, one month and ten days after he first complained of what he knew to be a blood clot, Mr. Barnhart was seen by a vascular surgeon via a telemedicine appointment. *See* Drs. Mushero & Solfisburg Decl. at ¶8. "Ankle-brachial index (ABI) tests were performed to assess blood flow to his legs, which showed mildly reduced blood flow on the right." *Id.* "The vascular surgeon recommended he start an antiplatelet medication such as aspirin (equivalent to the clopidogrel he was on previously) and a statin (which he should have already been on), but these were not started until October 2023 after he saw a cardiologist who made the same recommendation." *Id.*

Importantly and to the detriment of Mr. Barnhart, "the vascular surgeon also recommended [Mr. Barnhart] be seen in person in 2-3 weeks, but he was not seen in person until over 5 weeks later, on 11/1/23." *Id.* "The delay in seeing a surgeon for treatment of this blood clot is significant in this case because prolonged blockage of blood flow by a clot increases the risk of compartment syndrome, which was a serious complication that Mr. Barnhart experienced." *Id.* As described *infra*, compartment syndrome is "severe swelling in an area of the body which causes destruction of the muscle tissue there because of the high pressures that develop." *Id.*

> On December 15, he had surgery to insert a catheter directly into the blood vessel to release medication to try to break open the blood clot ("catheter directed thrombolysis"). It is at this time that the risk of compartment syndrome occurs and this very severe complication happened to Mr. Barnhart. Compartment syndrome

>can be threatening to both life and limb and the treatment, which is cutting into the affected limb to relieve the pressure, creates additional wounds which cause pain and risk infection.

*Id.*

Doctors Mushero and Solfisburg conclude by underscoring that "[a]n arterial blood clot in a limb is a serious condition that, even with appropriate treatment, can cause disability and lead to amputation. Yet, while incarcerated, he was not receiving the standard of care and recommended treatments for this condition, which include a high-intensity cholesterol lowering and clot stabilizing medication, an antiplatelet medication, and a blood thinner at a full treatment dose. This has resulted in progression of his disease and increased morbidity and created the risk of permanent, irreversible damage to his leg including possible amputation; and death." *Id.*

Finally, even once he returned from the hospital, having had to undergo two surgeries and experiencing a serious complication, the BOP still could not properly care for Mr. Barnhart. "After his hospitalization, his hospital team, including his surgeons, discharged him with instructions to take oxycodone as needed for pain. The dose they prescribed for him was three times the dose he was actually given by the prison, despite the initial prescription being included in both the discharge summary and in faxed documents sent to the prison." *Id.* at ¶10; *see also* Medical Records at 34 ("UK d/c [discharge] summary mentions oxycodone 10 every 4 hours. It was ordered 5mg QID [4 times a day] upon return."). Because of the improper dosage Mr. Barnhart "[had] significant pain[.]" *Id.* He repeatedly complained for more than 14 hours, from 9:35 a.m. through 11:55 p.m., on December 25, 2023, "report[ing] that [] his pain level is unacceptable" and stating that "This pain is more that I can stand." *Id.* at 42-47.

As Drs. Mushero and Solfisburg explain, "[t]he poor pain control caused further problems as on 12/25/23, Mr. Barnhart reported so much pain he needed to have one of his wound vacs removed. The wound vacs are important for optimal healing of the wounds, as was acknowledged in the refusal form Mr. Barnhart signed to get the wound vac removed." Drs. Mushero & Solfisburg Decl. at ¶10; *see also* Medical Records at 30 ("They took the hose/wound vac off the right side because I was in so much pain."). Notably, while "[h]is oxycodone dose was subsequently increased when he was seen by an MD the next day, … this was only after inadequate pain control led to the discontinuation of one of his wound vacs." Drs. Mushero & Solfisburg Decl. at ¶10.

On January 9, 2024, Mr. Barnhart described to counsel two large open wounds on each side of his right leg that look "gnarly." He was told that eventually skin would grow over them and he would be left with two large scars, but at the moment they were just open wounds where he could see bare muscle. *See also* Medical Records at 5 ("Inmate stated they were not going to sow or staple shut was going to allow to close naturally. Inmate seemed disappointed in the news wanted the wounds closed."); *see also id.* at 34 (describing wounds measuring approximately 8 inches by 2 inches by .2 inches on the outside of his leg and 9 inches by 2 inches by .2 inches on the inside of his leg). These wounds were not inevitable. They were a direct consequence of the BOP's "significant and unusual delay," Drs. Mushero & Solfisburg Decl. at ¶9, in providing proper care for his blood clots.

        *ii.*    ***Heart Attack Follow-up Care***

The BOP is also failing to properly treat Mr. Barnhart's heart disease or ameliorate the risk of further heart attacks or strokes. "During his hospitalization for his right leg blood clot in

11

October 2021, Mr. Barnhart was found to have what is called a 'silent myocardial infarction' or heart attack that did not present with symptoms at the time but is found with testing after the fact." *Id.* at ¶11.  An echocardiogram "showed reduced heart function likely due to his silent myocardial infarction." *Id.* at ¶12.  Because further testing showed a complete blockage of a heart vessel, "a stent (the usual treatment for a blocked artery) could not be placed and the decision was made to treat his heart attack by optimizing his medication regimen." *Id.* at ¶11. Therefore, "[h]e was discharged with a cholesterol lowering medication and an antiplatelet medication (the same medications recommended to treat peripheral arterial disease as described above), which were appropriate given his heart attack." *Id.*  As already noted, those medications were not consistently provided to Mr. Barnhart during his time in BOP custody, despite their importance to his heart health.  It also appears that neither the hospital in 2021 nor the BOP has started Mr. Barnhart on a beta-blocker, "which could have been helpful in preserving healthy heart muscle." *Id.*

Mr. Barnhart's prior heart attack "puts him at increased risk for heart failure in the future." *Id.* at ¶12.  It was therefore recommended in October 2021 that he "have a repeat ultrasound 6 months after his heart attack to check if his heart function had returned to normal. This is important to determine if he needs other medical therapies to preserve his heart function." *Id.*  "This test should have been done as early as the spring of 2022 but records indicate it has yet to be accomplished." *Id.*  Doctors Mushero and Solfisburg underscore that "he should have this test as soon as possible to determine his optimal medical regimen which could include additional medication therapies (examples include blood pressure medications,

beta blockers, ARB or SGLT2 inhibitors such as empagliflozin, which are all the standard of care for people with reduced heart function)." *Id.*

### iii. *High Cholesterol and Risk of Heart Attack/Stroke*

In addition, Mr. Barnhart has high cholesterol and yet the BOP repeatedly stopped his statin, which places him at risk both for another heart attack or stroke and another blood clot. His lab testing in June 2023 showed significantly elevated cholesterol, which decreased somewhat after the statin was finally prescribed, but which "remain[s] elevated, which puts him at risk for another heart attack or a stroke." *Id.* at ¶13. "Mr. Barnhart's statin medication was stopped intermittently over the course of his time in prison due to labs showing increased levels of a protein called CPK, which is a marker of muscle breakdown and can be a side effect of statin medications. Nonetheless, the elevated levels of CPK were mild and could have been due to vigorous exercise, and *were not high enough to warrant stopping his essential statin medication, which is crucial for protecting his heart and reducing his risk of another blood clot in his leg.*" *Id.* (emphasis added).

### iv. *Teeth Infections*

Mr. Barnhart has had severe tooth pain since June 2023. In June a dentist diagnosed him with a tooth impaction, "where an in-growing tooth becomes trapped by nearby teeth, as well as an infection of his gums." *Id.* at ¶14. He was prescribed antibiotics and Tylenol and referred to an oral and maxillofacial surgeon for removal of the impacted tooth, to be performed by June 30, 2023. *Id.* Yet, "they didn't have any pain killer for me at the pharmacy" and "I was told it would take 6 to 9 months before [I] could get surgery but the pain is so great [I] can[']t bite down at all." Medical Records at 415. The pain was so great that Mr. Barnhart wrote to his institution

13

that "If there is any other possible way of resolving this, like me paying out of pocket at a local dentist, [I] would be all for it. [T]hank you very much!" *Id.* As of January 2024, he has three affected teeth in total, two of which have been hurting him for over a year, and "[y]et, the extractions have now been 'deferred.'" Drs. Mushero & Solfisburg Decl. at ¶14. It is unknown when Mr. Barnhart's infected teeth will finally be dealt with while he remains within the BOP's control.

  **v.**  *Together these conditions qualify under U.S.S.G. § 1B1.13(b)(1)(B)(i). (b)(i)(C), and (b)(5).*

Following their review of Mr. Barnhart's treatment in BOP custody, Doctors Mushero and Solfisburg conclude as follows:

> 15. Mr. Barnhart has several serious medical conditions that the BOP has not properly managed according to widely-accepted standards of care. His recurrent right leg arterial clots, if not appropriately managed, put him at high risk for complications including permanent disability, loss of limb, and death. Yet he was not provided cholesterol lowering medication and an antiplatelet medication in a timely manner, and his blood thinning medication was in an inadequate dose for months, all of which are essential in trying to prevent severe complications such as the exact ones that Mr. Barnhart suffered – more clots and compartment syndrome. His prior heart attack puts him at risk for further heart attacks or strokes, and he may still have reduced heart function that increases his risk for heart failure in the future, yet he has not had the follow-up ultrasound to review his heart's health. He requires higher statin doses to control his cholesterol. His impacted tooth, while it was recommended to be excised by June 30, 2023, remains in his mouth, and he now has two others causing him pain.
>
> 16. In our medical opinion, Mr. Barnhart requires regular appointments with specialists, who will help ensure he receives the standard of care to preserve his mobility and prevent further clots, heart attacks, or other complications from his medical conditions. Mr. Barnhart also requires a timely appointment with an oral and maxillofacial surgeon to remove his affected teeth. It is not clear that his current location is able to provide him with the standard of care required to manage his complex health conditions.

Drs. Mushero & Solfisburg Decl. at ¶¶15-16.

As these paragraphs and the entirety of their declaration describe, Mr. Barnhart is both "suffering from a serious physical or medical condition" that "substantially diminishes [his] ability [] to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover" and "suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which [he] is at risk of serious deterioration in health or death." U.S.S.G. § 1B1.13(b)(1)(B)(i) & (C). His serious conditions and delay in treatment are also fully consonant with § 1B1.13(b)(5), which allows for a reduction in sentence for "Other Reasons," that is, where "[t]he defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4)." He therefore has presented extraordinary and compelling reasons for his reduction in sentence.

### C. The Section 3553(a) Factors Support Mr. Barnhart's Immediate Release.

Mr. Barnhart's eight months of imprisonment have been more punishment than eight months of imprisonment for a healthy individual. He has spent the entire time either worrying that the BOP's inability to properly prescribe him the needed medications will result in a loss of limb; or in intense pain; or begging to be seen by the right professionals for what he knew to be the same blood clot; or hospitalized because of the BOP's incompetence; or some combination thereof. He cannot—and should not be forced to—spend two more years worrying that they will not listen to him when he complains of his leg pain, that they will not prescribe the medications that all outside medical professionals agree are key to preserving his limbs, heart, and life, or that

they will not take him to the correct specialists who know how to treat his symptoms in a timely manner.

There is no other place in the BOP that could be doing it better—Mr. Barnhart is at a federal medical center, which is supposedly designed exactly for those individuals sentenced to prison with complex medical conditions. Yet the medical center's delays led to pressure building up so badly in his leg that the only treatment was to cut two incisions 9 inches long on the sides of his right leg and then to leave those incisions open, with his bare muscle showing, to relieve the swelling. The consequences of further delays in treatment could be even more severe.

Mr. Barnhart's recidivism level, according to the BOP itself, is low, as is his security classification. *See* Ex. 5, BOP Records at 5 (Inmate Profile). While his poor health and hospitalizations has left little time for programming, he has worked and taken classes when able. *Id.* at 4, 6-7. He has fulfilled his financial obligations, *id.* at 4, and he has had no disciplinary incidents, *id.* at 8.

Although this Court concluded that a 36-month sentence was appropriate when it first sentenced Mr. Barnhart, in light of all that he has experienced since, the calculus has changed. A sentencing calculation must always consider the need to "provide the defendant with needed . . . medical care . . . in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). Yet Mr. Barnhart's current sentence is failing, repeatedly and with dire consequences, to do so. Rather, a reduced sentence to time served, with home detention as a condition of supervised release, is most appropriate to account for Mr. Barnhart's health and wellbeing. He will live with his parents in Holt, Michigan and return to the same doctors and specialists who already understood the gravity of his conditions and properly managed them before his imprisonment.

## V. Conclusion

Mr. Barnhart respectfully moves this Court for a reduction in sentence to time served with a period of home detention to follow.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
JOANNA MUNSON PERALES
Research & Writing Attorney
Federal Public Defender's Office
625 Indiana Ave, NW, Suite 550
Washington, D.C. 20004