United States District Court
For The District of Columbia

| | |
|---|---|
| **United States of America,**<br><br>v.<br><br>**Logan James Barnhart,**<br><br>**Defendant.** | Case No. 21-cr-35-6 (RC) |

**Reply in Support of Motion for a Reduction in Sentence**

At his April 2023 sentencing, Mr. Barnhart repeatedly raised the risk of losing his leg. "[T]here's a good chance I was going to lose my leg," he explained about researching prosthetic limbs while hospitalized. Sent'g Hr'g Trans. (Apr. 13, 2023) at 43, ECF No. 400. "I obviously did not want to lose my leg," he noted when describing walking in his tight trailer living room while on home detention so that he could maintain the exercise schedule required by his doctors. *Id.* at 44. Mr. Barnhart, for whom these "injuries . . . ha[d] taken a serious toll . . . not just physically but mentally because I had always been a proud . . . healthy person," knew that "I would be at high risk of amputation, basically, the rest of my life." *Id.* at 43-44.

Yet, in the government's telling, two months later, Mr. Barnhart reported to prison and did not inform staff of the medications he needed so that he would *not* lose his leg. *See* Gov't Opp'n (Mar. 4, 2024), ECF No. 436, & Gov't Ex. 2 (Sealed). This beggars belief, and is contradicted by Mr. Barnhart himself. *See* Ex. 6, Barnhart Decl. (Mar. 19, 2024). Instead, Mr. Barnhart repeated again and again that he required medications for his clotting issue; he repeated again and again that he was in pain and that the pain was identical to the clots he had experienced

1

previously; and again and again, he was not listened to. But he was right: a mere two months after coming to prison, he had another clot. It then took *four* months to be treated. He is now left with long scars down each side of his right leg. And a justified fear that, next time, he also won't be listened to and, next time, he very well may lose his leg or his life.

Had Mr. Barnhart been on the outside, and not reliant on the BOP for every single aspect of his care and treatment, he would have walked into an ER the moment he felt that clot and, four months earlier than it actually happened, been treated accurately for what he *knew* was the same clotting issue he had previously experienced. In fact, he may never have gotten that clot because, had he been on the outside and not in the BOP's care and custody, he would have continued to take the same medications prescribed to him by experienced doctors involved in his care since his first clot. And if he had ultimately still developed a clot or still developed compartment syndrome (less likely because he would have been treated sooner), he would not have been released into a lightly-staffed prison because it was the Christmas holiday, where his pain medication was cut by two-thirds, he suffered grievously, and his wound vac had to be removed, leading to a wound that healed much slower than the other side. He would instead have been released into the loving care of his family who would have followed doctors' instructions and monitored his pain.

But Mr. Barnhart was at the mercy of the BOP for every aspect of his care and treatment, to his ultimate detriment. Granting him a reduction in sentence now would recognize two important factors: *first*, that the ten months he has so far been imprisoned, the majority of which he has been in intense pain, not prescribed the right medications, hospitalized, or ignored, have been far more punitive than that experienced by healthy individuals; and *second*, that remaining

imprisoned risks losing life or limb because no one is listening to him or his lived experience of his leg clots. There is little reason to think the next time will be any better.

A. *The government cites the wrong legal principles in arguing against relief.*

The government relies on two 2021 cases to argue that Mr. Barnhart does not meet the "extraordinary and compelling" standard, without realizing that those cases were decided in a unique moment of time that no longer reflects the relevant standards today. *See* Gov't Opp'n at 6-7 (citing *United States v. Hunter*, 12 F.4th 555, 562 (6th Cir. 2021); *United States*, v. *Shabazz*, No. 17-cr-43 (JDB), 2021 WL 4306129, at *3 (D.D.C. Sept. 22, 2021)).

In 2018, Congress passed the First Step Act, which, for the first time, authorized defendants to seek a reduction in sentence from the court directly, rather than relying exclusively on the BOP to bring a motion forward on his behalf. *See United States v. Long,* 997 F.3d 342, 348 (D.C. Cir. 2021). The U.S. Sentencing Commission, however, had last issued its policy statement regarding reductions in sentence (U.S.S.G. § 1B1.13) before passage of the First Step Act, and lacked a quorum after its passage to make any changes to the Guidelines to reflect the new statutory regime. *Id.* at 349. Thus, until the Commission amended the Guideline, U.S.S.G. § 1B1.13 was "not 'applicable' to defendant-filed motions for compassionate release under the First Step Act," because it "applie[d] only to motions . . . filed by the Bureau of Prisons." *Id.* at 355.

Without the binding policy statement from the Commission, courts considering defendant-filed motions were left interpreting the "extraordinary and compelling" terms used in 18 U.S.C. § 3582(c)(1)(A) itself, as reflected in the two cases to which the government cites. But as the U.S. Solicitor General recognized in 2021, "the Sentencing Commission could promulgate

3

a new policy statement that resolves the disagreement [about what constitutes 'extraordinary and compelling']" and "[n]obody disputes . . . that the Commission has the power—indeed, the statutory duty—to promulgate a policy statement that applies to prisoner-filed motions[.]" Br. for U.S. in Opp'n to Grant of Cert., *Jarvis v. United States*, No. 21-568, 2021 WL 5864543, at *12, *17–20 (Dec. 8, 2021).[1]

The Sentencing Commission has done just that. *See United States v. Wilson*, 77 F.4th 837, 841 (D.C. Cir. 2023) (recognizing that "the United States Sentencing Commission amended its guidelines regarding what constitutes an extraordinary and compelling reason for release" and that this "update will become effective on November 1, 2023"). Because 18 U.S.C. § 3582(c)(1)(A) states that any reduction must be "consistent with applicable policy statements issued by the Sentencing Commission," it is these policy statements—and not any dictionary definitions, *see* Gov't Opp'n at 6-7 & n.3—that inform this case.

The Commission's amendments now allow § 1B1.13 to cover defendant-filed motions. *See* U.S.S.G., Supp. to App. C, Amend. 814 (eff. Nov. 1, 2023) ("Upon motion of the Director of the Bureau of Prisons *or the defendant* pursuant to 18 U.S.C. § 3582(c)(1)(A)…") (emphasis added). Thus we now have a policy statement that is "applicable" to a defendant-filed motion, like the one pursued here. In this policy statement, the Commission makes clear that certain medical conditions and experiences qualify as "extraordinary and compelling." These include

---

[1] *Accord* Mem. for U.S. in Opp'n to Grant of Cert., *Watford v. United States*, No. 21-551, 2021 WL 5983234, at *2 (Dec. 15, 2021) (opposing a petition for certiorari because "the Sentencing Commission could promulgate a new policy statement that deprives a decision by this Court of any practical significance"); Mem. for U.S. in Opp'n to Grant of Cert., *Williams v. United States*, No. 21-767, 2022 WL 217947, at *2 (Jan. 24, 2022) (same); Mem. for the U.S. in Opp'n to Grant of Cert., *Thacker v. United States*, No. 21-877, 2022 WL 467984, at *2 (Feb. 14, 2022) (same).

that the defendant is "suffering from a serious physical or medical condition" that "substantially diminishes [his] ability [] to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover" and "from a medical condition that requires long-term or specialized medical care that is not being provided and without which [he] is at risk of serious deterioration in health or death[,]" and "any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4)." U.S.S.G. § 1B1.13(b)(1)(B)(i) & (C), (b)(5).

Thus, this Court need not consider what the terms "extraordinary and compelling" would have meant in 1971, *see* Gov't Opp'n at 6, because Congress tasked the U.S. Sentencing Commission with defining those terms, it has now done so for defendant-filed motions, and Mr. Barnhart's conditions and treatment are extraordinary and compelling under the Guideline's terms.

B. ***The government claims bias by Mr. Barnhart's experts, but Dr. Randolph has a vested interest in burnishing BOP's poor reputation where its healthcare has been described as "fail[ing] to treat serious illnesses fast enough," lacking in independent oversight, and suffering from severe staffing shortages leading to "a terrible situation for many offenders with medical issues."[2]***

The government suggests Dr. Mushero is biased, Dr. Solfisburg inexperienced, and that their concerns be accorded less weight because neither met with Mr. Barnhart himself. *See*

---

[2] *See* Meg Anderson, *1 in 4 inmate deaths happens in the same federal prison. Why?* NPR (Sep. 23, 2023), available at https://www.npr.org/2023/09/23/1200626103/federal-prison-deaths-butner-medical-center-sick-inmates; Meg Anderson, *Lawmakers push for federal prison oversight after reports of inadequate medical care*, NPR (Dec. 12, 2023), available at https://www.npr.org/2023/12/12/1218627629/lawmakers-push-for-federal-prison-oversight-after-reports-of-inadequate-medical- .

Gov't Opp'n at 6.  Yet Dr. Mushero and Dr. Solfisburg's review of Mr. Barnhart's records are just the sort of independent oversight that is desperately needed in the BOP.  As Dr. Homer Venters, once the chief medical officer of New York City's jails, stated about the federal prison system, "My question is: Why do we have one of the nation's biggest health services not really being overseen by anybody outside of them?" Meg Anderson, *1 in 4 inmate deaths happens in the same federal prison. Why?* NPR (Sep. 23, 2023) (hereinafter, "Anderson, *1 in 4 inmate deaths happens in the same federal prison*").[3]

U.S. lawmakers are also alarmed, "specifically call[ing] for more independent supervision of the BOP, which operates with little transparency or oversight.  For instance, until NPR published its investigation [detailing numerous accounts of federal prisoners nationwide going without needed medical care], the bureau stated on its website that it was accredited by the Joint Commission, which accredits the vast majority of U.S. hospitals, when in fact its certification had lapsed two years prior.  The claim has since been deleted." Meg Anderson, *Lawmakers push for federal prison oversight after reports of inadequate medical care*, NPR (Dec. 12, 2023) (hereinafter, "Anderson, *Lawmakers push for federal oversight after reports of inadequate medical care*").[4]

"People who are incarcerated on average have at least two chronic conditions, so they tend to be very sick, more sick than the general population," explains Lauren Brinkley-Rubinstein, an associate professor at Duke University who studies the health impacts of the criminal legal system.  *See* Transcript, *1 in 4 inmate deaths happens in the same federal prison. Why?*

---

[3] Available at https://www.npr.org/2023/09/23/1200626103/federal-prison-deaths-butner-medical-center-sick-inmates.

[4] Available at available at https://www.npr.org/2023/12/12/1218627629/lawmakers-push-for-federal-prison-oversight-after-reports-of-inadequate-medical-.

NPR (Sep. 23, 2023) (hereinafter, "Transcript, *1 in 4 inmate deaths happens in the same federal prison.*").[5] Yet, in an extensive investigation into health care in BOP custody, "NPR [] found stories of inmates at prisons all over the country going without needed medical care. We found more than a dozen who waited months or even years for treatment, including people with symptoms that were obviously concerning - unexplained pain, bleeding, lesions, a lump that wasn't there before." *Id.* As one current medical staff member at another FMC described it, "'So many inmates have told me, I complained about this lump, or I complained about this pain for so long, and they only gave me cream. They only gave me Motrin. They never sent me out for tests or anything.'" *Id.*

NPR's "investigation described a pipeline in which the BOP funnels the seriously ill to a prison hospital like the one at Butner, where it is expected they'll receive more intensive treatment. However, NPR documented multiple examples of substandard care there as well, including delays in treatment and mismanaged medications." Anderson, *Lawmakers push for federal oversight after reports of inadequate medical care*. As Senator Dick Durbin (D-Ill.) explains, "'Simply transferring incarcerated adults to new facilities in the hope that they will receive care, without adequately addressing the dire staffing issues or fortifying facility medical units, is not a solution.'" *Id.*

Instead, Senator Durbin and Senator Chuck Grassley (R-Iowa), "[t]wo key senators on the committee tasked with overseeing the nation's federal prisons[,] are now urging the Bureau of Prisons to fix a medical care system that has allowed people in its care to die preventable deaths." *Id.* Senator Grassley underscored his concern: "'I'm deeply alarmed by reports that

---

[5] Available at https://www.npr.org/transcripts/1200626103.

the Bureau of Prisons has demonstrated foot dragging when it comes to providing medical care to those in its custody.  BOP needs to be held responsible for this failure and take action to raise its standards.'"  *Id.*

But it cannot do so at the current staffing levels.  Colette Peters, the BOP Director, recognizes this problem: "'Recruitment and retention of our employees remain a challenge. . . . One of several pronounced areas of challenge is the hiring and retention of healthcare professionals.'"  Anderson, *Lawmakers push for federal oversight after reports of inadequate medical care*.  As Robert Hood, a former warden who worked at the BOP for more than two decades, explains, "'Clearly, the critical lack of staff impacts the safety and security of federal prisons.  Equally as important, the healthcare for 160,000 federal inmates is under fire... What a terrible situation for many offenders with medical issues.'"  *Id.*

Delshon Harding, president of the union representing Butner correctional officers, makes clear: "'With the cuts to the staffing, we can't provide the security that is needed, we can't provide the medical treatment that is needed and the safety that's needed to fulfill the mission.'"  Anderson, *1 in 4 inmate deaths happens in the same federal prison*.  Notably, there is no reason to think FMC Lexington, where Mr. Barnhart is held, is any better staffed than FMC Butner.  After all, "[t]he Kentucky Hospital Association's annual Workforce Survey Report says Kentucky suffers from an 'acute shortage' of health care workers."  Melissa Patrick, *Health-care worker shortage hitting Kentucky 'especially hard,' says hospital association exec*, Kentucky Lantern (Nov. 28, 2023).[6]

---

[6] Available at https://kentuckylantern.com/2023/11/28/health-care-worker-shortage-hitting-kentucky-especially-hard-says-hospital-association-exec/.

Notably, the Department of Justice Office of Inspector General issued a report in March 2022, and in it stated, "'we found that the BOP faced challenges in transporting inmates to off-site appointments which resulted in a frequent need to reschedule appointments that could delay an inmate's healthcare'"; "'BOP also did not have a process in place to monitor how long an inmate waited to receive care after a cancelled appointment'"; and because it had no systems to monitor either issue, "'we believe it is difficult for the BOP to determine whether inmates are receiving care within the required community standard.'" Walter Pavlo, *Federal Bureau Of Prisons' Medical Care Falls Short Of Its Own Policy*, Forbes (Aug. 19, 2022).[7]

As one experienced lawyer explained, "staffing matters because an inmate who needs to be seen by a provider or specialist out in the surrounding community, for example, requires more resources. 'What that entails is putting the prisoner in a transport vehicle, taking them into the community, bringing them into a hospital, with staff going along and being pulled away from their other responsibilities. So that is generally a pretty heavy lift just to get that level of attention.'" Anderson, *1 in 4 inmate deaths happens in the same federal prison*. Mr. Barnhart was not given that level of attention, to his serious detriment.

## C. Dr. Randolph does not explain why Mr. Barnhart was ignored when he repeatedly asked to be placed on Warfarin, or why, if appropriate to be on Apixaban, it took six weeks to increase the dose after clotting symptoms; he does not dispute that Mr. Barnhart was on Plavix before prison but not prescribed this medication for four months.

Dr. Randolph does not dispute that it took 6 weeks from when Mr. Barnhart complained of symptoms of a blood clot to increase the dose of the blood-thinning medication Apixaban or that doctors did not place Mr. Barnhart on what he explained was the more effective medication

---

[7] Available at https://www.forbes.com/sites/walterpavlo/2022/04/19/federal-bureau-of-prisons-medical-care-falls-short-of-its-own-policy/?sh=c1cb70f5eab3.

Warfarin that the BOP confirmed he was on prior to incarceration. *See* Ex. 2 at 268 (APRN Stone note on June 9, 2023: "Confirmed he was previously on Warfarin 7.5 mg 1 1/2 tablet daily per instructions by clinic.").[8] He does not dispute that Mr. Barnhart had been taking Plavix (Clopidogrel) prior to his incarceration, that is important in anticlotting, and that the institution failed to provide him with this medication until months after he complained of clotting symptoms. *See* Ex. 1 at ¶6. Dr. Randolph's main contention appears to be that they did not have "documentation listing then-current prescription medications"—notwithstanding the June 9 note to the contrary—and none was listed on his intake forms. But Mr. Barnhart did not fill out those forms; he relied on the institution to accurately fill out those forms, and he would have had no reason to *not share* the medications he was taking that he believed were keeping him from a blood clot and possible leg amputation.

Instead, Mr. Barnhart arrived at prison with his pill bottles, having taken his last doses the morning that he reported for his imprisonment. He was told he could not bring them in. *See* Ex. 6 at 2. Outside medications (and empty bottles of outside medications and indeed anything from the outside at all including medical records) were not allowed into the prison, so, the moment that the prison door closed behind him, Mr. Barnhart was at the mercy of prison officials to list his medications accurately, listen to his medical history accurately, and review his medical records correctly. As Mr. Barnhart explains,

> I absolutely would have listed my medications if given a chance. I took my last dose of Coumadin and Plavix right before I left the hotel to turn myself in. I knew it might be a day or 2 before I got my medications and didn't want to go long without them.

---

[8] Drs. Mushero and Solfisburg thought that Mr. Barnhart had been switched back to Apixapan before entering the BOP, but this switch only occurred after he was in BOP custody, as confirmed by Mr. Barnhart's declaration and the FMC Lexington APRN Stone's note. *See* Ex. 6, Barnhart Declaration at 2; Ex. 2 at 268.

> I was asked questions about my past drug use and was asked about tattoos. I do not remember being asked about my current prescriptions but if I had I would have most certainly listed them. I was glad to be at a medical facility and was worried about my leg so I would have no reason to not report my medications.

Ex. 6 at 2. Indeed, Mr. Barnhart's recollection is supported by the intake documents themselves, which simply state that he has no known "OTCs", *i.e.*, over the counter medications, and do not at all address his current *prescribed* medications, *see* Ex. 2 at 277 & 293.

Instead, his current medications were first discussed on June 9, 2023 when he finally met with a doctor, and Mr. Barnhart made clear that he needed Coumadin (Warfarin). *See* Ex. 2 at 269 ("He was taking Coumadin prior to arrival here."). He *did not* state that he was on Coumadin/Warfarin only as a precaution, *see* Gov't Ex. 2 at ¶6: "I said I was told I would eventually be able to stop taking them and that I wouldn't have to take them for the rest of my life. I was well aware that I was told I would have to take them for at least 2 years before I would be re-evaluated." Ex. 6 at 2.

Dr. Thompson ordered him back on Apixaban anyways. It simply is not persuasive to say that his medical records were too old, *see* Gov't Ex. 2 at ¶7—if there were any question about what medication orders were still active and in what amounts, medical staff simply had to ask Mr. Barnhart himself. In fact, Mr. Barnhart *did* inform the BOP of his medical history, including his 18 months on Warfarin (Coumadin) and Plavix (Clopidogrel), but they did not listen:

> At the appointment, Dr. Thompson prescribed me Apixaban. I informed him that I was not supposed to take Apixaban because it had already failed me once prior. I described to them both in detail about how the ankle monitor had caused a blood clot in my leg and after it was cleared I was put on Apixaban and sent home. About 5 days later I returned to the hospital in Lansing, MI with pain in my foot which turned out to be another clot in the same artery. After a second surgery the clot was cleared and I was told I would now have to take Coumadin because the Apixaban had failed me. My surgeon at the time made it very clear to me I could no longer take Apixaban because for a small percentage of people, Apixaban was ineffective

11

> and I was one of those people. So for the next 18 months I had followed his orders and taken Coumadin and Plavix and had no issues at all. I explained all of this to Dr. Thompson at length[.]

Ex. 6 at 2.

Mr. Barnhart had a vested interest in his health and knew his own medical history. As he explains when countering Dr. Randolph's claim that it was appropriate for him to be on a decreased dose of Apixapan because 6 months had passed on a higher dose, *see* Gov't Ex. 2 at ¶13, he had never been on that higher dose for those time periods: "I never took the 10mg or the 5mg for at least 3 months because I was on Coumadin for 18 months before arriving at FMC Lexington. I was informed that Apixaban and Coumadin work in significantly different ways. So [i]f I was going to change medications it stands to reason that I should have started off with 10mg and done everything correctly." Ex. 6 at 3.

In any event they appear to have known exactly what he was taking (Warfarin, 7.5 mg tablets, 1 ½ tablets daily, and Plavix, 75 mg oral capsule, daily) on June 9. *See* Def. Ex. 2 at 455. That day, Dr. Thompson "had me visit the medical records department where I signed a form for them to receive my medical records which included my medications I was currently taking and the fact that I was taken off Apixaban because of its failure." Ex. 6 at 2. By June 9, therefore, whatever the institution might have known when he first arrived, they had in their possession information that he had clots previously, that he had taken specific medications (Coumadin/Warfarin and Plavix/Clopidogrel), and that the Coumadin/Warfarin was more effective than Apixaban. This should have been sufficient to either provide those medications to Mr. Barnhart *or* at the very least prescribe him an increased dose of Apixaban and begin the Plavix once he complained of a clot. The BOP did none of these.

That a lower dose of Apixaban may have been appropriate when no one suspected that he was suffering from a new blood clot, *see* Gov't Ex. 2 at ¶13, does not in any way explain why it took until September 22, 2023 to raise the dosage of Apixapan when Mr. Barnhart repeatedly complained of pain in August that felt just like what it did when he twice had blood clots. And it does not explain why he was not placed on the antiplatelet medication Plavix/Clopidogrel immediately upon his imprisonment or why it took until the end of October to do so. And as further discussed *infra*, Dr. Randolph simply fails to adequately explain the repeated delays to mid-December for effective treatment of the clot in his right leg, after which he developed compartment syndrome and a fear that, next time, he will lose his leg.

### D. Mr. Barnhart repeatedly stated that his leg felt identical to his prior clot but it took four months to accurately image and treat it, and the delay led to compartment syndrome.

According to Dr. Randolph, it might not have been a clot, and thus delays in treatment were justified, because of several factors: that the pain stopped when Mr. Barnhart rested and that blood flow wasn't completely blocked according to his Ankle Brachial Index (ABI). *See* Gov't Ex. 2 at ¶11. But as Mr. Barnhart explained to counsel, these were both true when he had the first two clots: both times, the pain stopped when he rested and there was some residual blood flow through what are called "collaterals," *i.e.*, arteries that form when the main flow of blood is blocked. This was, indeed, confirmed by the imaging that was finally performed ten weeks after he first complained of pain: Dr. Randolph described that "Dominant flow to the right lower extremity was via collateral vessels that reconstituted flow beyond the occluded arteries (per imaging on 10/26/23)." Gov't Ex. 2 at ¶17. As Mr. Barnhart explains about the ABI results, "The fact blood flow wasn't completely blocked was even more reason to act

13

quickly! Before it got worse and did become completely blocked which is exactly what happened to me, the very first time, before incarceration." Ex. 6 at 2.

Dr. Randolph accurately notes the recommendations made by the vascular clinic specialist on September 25, which included many forms of imaging and a "limb salvation" doctor, as if the fact of the recommendations alone means that Mr. Barnhart was properly treated. But imaging *did not* actually take place until four weeks later—and it was this imaging that, finally, revealed the clot, led Mr. Banhart to finally be seen by a vascular surgeon, and kick-started the urgency to receive thrombolysis surgery (although that too still took 6 *more* weeks to go through the BOP's approval process). Had Mr. Barnhart walked into an ER on August 14, he could have received imaging right then and there to confirm that clot and receive that treatment.

Dr. Randolph baldy claims that "the six week wait for the [vascular surgeon] appointment was not detrimental to Mr. Barnhart's condition," ¶16, without recognizing that the longer a clot is left untreated is inherently detrimental to a person's condition. In fact, the vascular surgeon recommended repeat thrombolysis at his November 1 appointment not just because of the "acuity" of his symptoms, but because of their "age," *see* Gov't Ex. 2. at ¶17—*i.e.*, *that he had suffered from a clot since at least August 14*. In fact, it is simply incorrect that the vascular surgeon (Dr. Lee) saw no urgency, *see* Gov't Ex. 2 at ¶16; he did, but he also understood the sad reality of BOP's delays. Dr. Lee counseled Mr. Barnhart to schedule the surgery before he even had a chance to talk to his family "because it would take the BOP a while to approve the procedure" and that "if he could, he would get me in that same day but unfortunately it would have to go through the BOP approval first. He turned out to be correct. It took another 6 weeks before I went in for surgery. A full 4 months after I first reported the clot." Ex. 6 at 2.

Dr. Randolph's counterfactual is meaningless. In it, he says: "If Mr. Barnhart had not experienced claudication in August 2023 and his anticoagulation had been discontinued in October 2023 as originally recommended, he would have more likely than not had a re-thrombosis of the right lower extremity after cessation of anticoagulation, resulting in the same outcome." Gov't Ex. 2 at ¶17. But Mr. Barnhart *did* develop a clot in August 2023, so the counterfactual for what might have occurred had he not done so tells us nothing about whether the BOP adequately responded to the clot that Mr. Barnhart *actually* suffered from. As Mr. Barnhart remarks,

> This is speculation! If I had been given the correct medication (Coumadin) and the Plavix (Clopidigrel) for the full 2 years this might not have happened. My original surgeon said I would be re-evaluated after 2 years before being taken off my medication. He may have extended it for all any of us know. What I do know is that I had already re-clotted taking Apixaban once. I went 18 months on Coumadin with no issues. I get here and despite voicing my concern I get put back on Apixaban only to re-clot roughly 2 months later!

Ex. 6 at 3. There was always a risk that Mr. Barnhart would develop another clot. The question here is whether the BOP's failure to provide him with needed medication and to promptly treat his complaint as the clot he knew it to be *increased* that baseline risk and delayed treatment with adverse consequences. It did.

Dr. Randolph states that compartment syndrome is a risk of arterial thrombolysis and revascularization, Gov't Ex. 2 at ¶18, but fails completely to address that "the risk of [compartment syndrome] . . . is *increased* by delay in treatment." Ex. 1 at ¶9 (emphasis added). That Mr. Barnhart may have had some risk of this complication simply from the procedure itself does not change the fact that the delay in receiving this procedure increased that risk further.

Dr. Randolph raises the quality of care at the University of Kentucky. Gov't Ex. 2 at ¶19.

Mr. Barnhart is not concerned about his treatment by the outside doctors at the University of Kentucky, *see* Gov't Ex. 2 at ¶19; he is concerned about his treatment within the BOP and the delays in accessing specialists, imaging, and treatment.  He is concerned that his very real—and ultimately correct—worry that he was once again suffering from a clot was not treated with the urgency it required.  While he may finally have been seen by a specialist and finally have had a thrombolysis performed and thankfully been treated for compartment syndrome by having large cuts made down both his legs, he does not want to have to experience any of these incidents again within the BOP's custody and care.

### E. *His post-surgical treatment at the BOP facility has lasting consequences, including a well-founded fear of future mistreatment.*

Dr. Randolph's attempt to soften the BOP's mistake of providing Mr. Barnhart with a third of the pain medication he was prescribed by the outside hospital is unpersuasive.  It makes no sense that Mr. Barnhart was given a lower dose of pain medication *because* he was admitted to the inpatient unit at the prison.  *See* Gov't Ex. 2 at ¶21.  As anyone who has been hospitalized has experienced, while admitted at the hospital with skilled nursing staff around, the medications can be much more powerful than those prescribed at discharge, when the person is going home to family or friends (or correctional officers), who are non-medical professionals unable to fully monitor the effects of those strong medications with frequent blood pressure checks, heart rate sensors, or visits with trained professionals.  That there were—or should have been (more on that below)—nursing staff to closely monitor him is all the *more* reason they would have provided him with the pain management dose he was prescribed.  As the term suggests, pain *management* is not just about reacting to pain already experienced but getting ahead of pain so that it will not

become overwhelming.  Yet this is exactly what occurred for Mr. Barnhart, with excruciating consequences.

Moreover it is not even true that there *were* adequate levels of trained nursing staff to closely monitoring his pain levels.  As Mr. Barnhart explains, "I was told by the UK staff that my wound vac had to be changed every other day to prevent infection.  The UK team changed it Thursday the 21st of December and told me that the prison staff would change it Saturday the 23rd, Monday the 25th and so on.  FMC skipped changing it on the 23rd despite me voicing my concern.  They said it was because they didn't have the staff or the correct parts to do the change.  They say I was 'closely monitored' in (#21) but if that was the case why didn't they have the staff or the correct parts to do my wound vac change[?]"  Ex. 6 at 3.

It is true he had no issues on December 24, Gov't Ex. 2 at ¶21, but this was because he still had the strong medications from the hospital in him.  Mr. Barnhart explains:

> Dr[.] Randolph himself said, when I finally saw him on Tuesday the 26th of December, that because the hospital sent me back on a Friday, of a holiday weekend, after the staff had left, caused me to have to wait until he got back to see if my pain management was adequate. When I was at the hospital, the day before I was sent back, I was on 10mg oxy every 4 hours and Dilaudid intravenously every 2 hours. So, my first day back I wasn't in [] too much pain because I still had all the pain medications from when I was in the hospital still in my system. Everyday got worse and worse. I requested more pain medicine on multiple occasions and [right] before I requested to have the wound vac removed, because of the pain, I was told by one of the nurses to "toughen up buttercup". I didn't find this very amusing because at this point I was in excruciating pain.

Ex. 6 at 3.

Because Mr. Barnhart was not on the higher doses of pain medication, his wound vac was extremely painful.  It was so incredibly painful that he could not take having the wound vac on. Dr. Randolph claims that this "ultimately did not cause Mr. Barnhart any long-term problems or

17

complications," ¶22, but, in fact, it took five more weeks for the fasciotomy without the wound vac to stop weeping fluids than it did the fasciotomy with the wound vac. *See* Ex. 6 at 3 ("Dr. Randolph says the early wound vac removal didn't cause any long term problems or complications but as we speak that wound is still weeping and requires bandages while the other side has been closed completely for at least 3 weeks."). And long-term problems and complications are not all that matter; it also matters that BOP's incompetence made Mr. Barnhart experience the worst pain he ever had experienced in his life.

It is fantastic that Mr. Barnhart is healing and that he has finally—and only since the filing of this motion—been seen by dental professionals and had his cholesterol checked. *See generally* Gov't Ex. 2 at ¶¶26-30. But this motion is not about whether, *despite* the BOP's failure to treat Mr. Barnhart properly, he is doing better today. His healing is in spite of, not because of, the BOP's delays and missteps. This motion is because these delays and missteps in care made Mr. Barnhart's time in prison so much more painful and full of fear than it otherwise would have been, and because this past experience makes it clear that these delays and missteps will likely continue to occur in the future, to Mr. Barnhart's detriment.

### F.  *A 36-month sentence is no longer appropriate now that this Court understands how his medical situation is mismanaged in BOP custody.*

The government claims that because this Court knew of Mr. Barnhart's medical issues at his original sentencing, it should not change its sentence now. Gov't Opp'n at 8-9. While true that the Court knew he had suffered from blood clots, it did not yet know how the BOP would mismanage his medications or his clotting symptoms. It did not yet know of the 16 weeks that would pass between his first complaint of clotting symptoms and his ultimate surgery. It did not yet know of the increased risk of compartment syndrome from the delay in treatment, or that he

18

did, in fact, suffer from this condition, leading to the fascia on both sides of his leg being cut open. It did not yet know that he would be given a third of the pain medication prescribed for him, or that he would be in the most excruciating pain he had ever experienced because of that mismanagement, or that the pain would occur during the Christmas holiday when the prison was lightly staffed so that there was a delay in increasing his dosage. It did not yet know that his wound would heal slowly because the pain was so great he could not take the needed wound vac remaining on one side of his leg. So yes, the Court knew that he had clots but it did not and could not have anticipated that his care in a Federal Medical Center would lead to this.

Now that the Court knows that the ten months of his imprisonment have been spent in pain, not on the correct medications or dosages, hospitalized, and ignored, and now that it understands that there is little reason to believe the next years will be any better, a sentence significantly less than 36 months is more than sufficient to punish Mr. Barnhart for his actions on January 6.

\* \* \*

For these reasons and those provided in his motion, *see* ECF No. 420, Mr. Barnhart asks this Court to immediately order his early release, with a period of home detention to follow.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
JOANNA MUNSON PERALES
Research & Writing Attorney
Federal Public Defender's Office
625 Indiana Ave, NW, Suite 550
Washington, D.C. 20004